CHEMICAL BANK, Plaintiff-Appellee,

v.

ARTHUR ANDERSEN & CO.,
Defendant-Appellant.

MANUFACTURERS HANOVER TRUST COMPANY and First Pennsylvania Bank, N.A., Plaintiffs-Appellees,

v.

ARTHUR ANDERSEN & CO.,
Defendant-Appellant.

SECURITY PACIFIC NATIONAL BANK, Plaintiff-Appellee,

v.

ARTHUR ANDERSEN & CO.,
Defendant-Appellant.

No. 109, Docket 83–7290.

United States Court of Appeals,
Second Circuit.

Argued Oct. 17, 1983.

Decided Jan. 20, 1984.

Peter Gruenberger, Weil, Gotshal & Manges, New York City, for plaintiffs-appellees Manufacturers Hanover Trust Co., First Pennsylvania Bank, N.A. and Security Pacific Nat. Bank.

Patterson, Belknap, Webb & Tyler, New York City, for plaintiff-appellee Chemical Bank.

Edward J. Ross, New York City, Breed, Abbott & Morgan, New York City, and Wilson & McIlvaine, Chicago, Ill., for defendant-appellant Arthur Andersen & Co.

Before FRIENDLY, VAN GRAAFEILAND and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

Arthur Andersen & Co. (Andersen) appeals, pursuant to 28 U.S.C. § 1292(b), from so much of an order of Judge Goettel in the District Court for the Southern District of New York, 552 F.Supp. 439 (1982), as denied its motion to dismiss the claims alleging violations of the federal securities laws in three actions brought by four commercial banks [1] which had made loans to Frigitemp Corporation (Frigitemp) and its wholly owned subsidiary, Elsters, Inc. (Elsters).

---

1. Chemical Bank was the plaintiff in one action, Manufacturers Hanover Trust Company and First Pennsylvania Bank, N.A., were plaintiffs in a second, and Security Pacific National Bank was plaintiff in a third. The complaints are essentially the same, and the four banks joined in a single brief and argument. For convenience we shall generally refer to the case as a single action and to the four banks as the Banks.

The appeal raises important issues concerning the application of § 10(b) of the Securities Exchange Act of 1934 and the SEC's Rule 10b–5 and of § 17(a) of the Securities Act of 1933 to commercial bank loans evidenced by notes and, in one instance, secured by a pledge of a security.

Frigitemp was a publicly held company whose stock was listed on the American Stock Exchange. The company was primarily in the business of selling, manufacturing and installing interior furnishings in hotels, restaurants, institutions and ships. During the early and mid-1970's, Frigitemp embarked on a course of rapid expansion, acquiring a number of other companies. It acquired Elsters for stock on January 11, 1977, effective as of December 31, 1976. In the early 1970's Frigitemp financed its operations by obtaining various secured and unsecured credit lines extended by several institutions, including Manufacturers Hanover and Security Pacific National Bank. The company's rapid expansion over the next several years, however, required larger amounts of capital to sustain its operations. After having mixed success in forays into the public debt and equity markets,[2] Frigitemp looked to the Banks for financing.

By a contract dated December 31, 1975 (the Secured Credit Agreement), the Banks agreed to provide Frigitemp with a line of credit up to $8 million. Pursuant to the Secured Credit Agreement, the Banks advanced $6.5 million to Frigitemp beginning in 1976. The loans were evidenced by Frigitemp's promissory notes maturing on July 1, 1977, and were secured by a pledge of Frigitemp customer notes receivable.

**2.** For example, in late 1971 Frigitemp entered the debt market by issuing approximately $2 million in subordinated convertible debentures. In the summer of 1973, however, Frigitemp's attempt to make a secondary offering of 250,-000 shares of common stock was aborted by prevailing adverse market conditions and the deflated price of the stock at that time.

**3.** On May 10, 1977, the Banks decided to require Frigitemp to retain Worden & Risberg, management consultants, to report on Frigitemp and Elsters. The firm issued its report on June 28, 1977.

In September, 1976, the Banks and Frigitemp began discussing the need to restructure Frigitemp's debt. Pending such restructuring, three banks in September, 1976, advanced $1.5 million evidenced by Frigitemp's one month promissory note to each bank; in October, 1976, they advanced an additional $3.5 million. Frigitemp gave each bank a promissory note maturing on February 28, 1977, which included the $1.5 million owed on the September financing. This maturity was later extended to April 30, 1977. In February, 1977, Frigitemp received an additional $4 million unsecured loan from all four banks, evidenced by promissory notes also maturing April 30, 1977.

In addition to the loans evidenced by the $6.5 million of secured notes maturing July 1, 1977, and the $9 million of unsecured notes maturing April 30, 1977, Frigitemp had other financial needs. As described by the report of Worden & Risberg, management consultants,[3] Frigitemp, in the latter half of 1976,

> experienced a substantial buildup of trade payables due to cost incurred on customer-caused delays—for which they have not yet been reimbursed—and to a substantial increase in contract backlog—for which they had to begin placing purchase commitments. These factors have created a serious working capital deficit that is now affecting both vendor confidence and job completion.

One of the unsettling factors was a receivable of $11 million from Litton Industries, Inc.; the 1976 year-end financial statements of Frigitemp, certified by Andersen and dated May 10, 1977, recognized $8.9 million of this as income.[4] However, the

**4.** The 1976 statements in an explanatory note, however, mentioned the uncertainty surrounding the Litton claim:

> [F]or certain claims with a recognized revenue value of approximately $8,900,000, it is not possible at the present time to predict the amount of the ultimate settlement of such claims either by negotiation with the Company's customer or binding arbitration.

Andersen's Auditor's Report, attached to the statements, noted that "the ultimate realization of the claimed amounts [the Litton claim] re-

receivable remained unpaid and Frigitemp's working capital deficit was interfering with its ability to operate. Suppliers, for example, were beginning to hold up on deliveries. As the consultants' report concluded, and as the Banks realized, Frigitemp needed "approximately $4 million additional working capital to get through the current cash crunch it [was] experiencing." Frigitemp thus needed not only to refinance the $15.5 million owing under the Secured Credit Agreement and the unsecured loan transactions, but to obtain an additional $4 million. It sought to achieve this latter financing by a loan to its newly acquired subsidiary Elsters, as described below.

The restructuring transaction occurred in early August, 1977. Although evidenced by three different agreements, an officer of Manufacturers Hanover averred that these "were structured as, and were intended to be, part of one single, integrated refinancing package", and we shall assume for present purposes that this was the case.

Under one set of agreements, the Banks extended the maturity date of the $6.5 million of notes issued under the Secured Credit Agreement from July 1, 1977 to July 1, 1978; the notes were amended by endorsements dated August 9, 1977 (the Note Endorsements). Under a second set of agreements, substituting for the $9 million of unsecured notes which had become due on April 30, 1977, Frigitemp issued to the Banks the same amount of unsecured notes dated August 9, 1977 and maturing March 31, 1978 (the Replacement Notes). Finally, the Banks advanced $4 million to Elsters for which they received promissory notes dated August 8, 1977, maturing March 31, 1978; Frigitemp guaranteed these notes

and pledged as security 100% of Elsters' common stock, 750 shares, pursuant to a Pledge and Security Agreement.

Frigitemp filed a petition in bankruptcy on March 20, 1978. By that time only approximately $4 million of the $15.5 million Frigitemp debt had been repaid.[5] At the same time Elsters ceased engaging in business. The Banks have realized some $2 million on the Elsters notes.

In this action, commenced in 1979, the Banks seek to hold Andersen and three principal officers of Frigitemp liable for their losses. The complaints allege that the Banks entered into the transactions with Frigitemp and Elsters in reliance on Frigitemp's financial statements audited and certified by Andersen for the years 1973–1976.[6] The Banks allege that Andersen knew that Frigitemp's financial statements were false and misleading in numerous respects, including the following: material overstatement of profits from long term contracts because of consistent understatement of the cost to Frigitemp of fulfilling such contracts; material overstatement of Frigitemp's income and current assets by inclusion of amounts claimed for material costs and work done as addition to or changes from specifications; and material overstatement of Frigitemp's accounts receivable by the inclusion of overbillings, of inclusion of unbilled and unbillable amounts, allocation of payments on current to older receivables, the $8.9 million Litton claim mentioned above, and other claims for work not performed. The first claim in the complaints alleges that in making such certifications Andersen violated or aided and abetted in the violation of § 17(a) of the Securities Act of 1933,[7] § 10(b) of the Secu-

corded as of December 31, 1976, is not presently determinable."

5. The Banks realized approximately another $1.6 million from the sale of Frigitemp's notes to third parties.

6. Andersen was not the auditor for Elsters and certified no financial statements for it.

7. Section 17(a) provides:
It shall be unlawful for any person in the offer or sale of any securities by the use of

any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

rities Exchange Act of 1934,[8] and Rule 10b–5 issued thereunder.[9]  Three other claims in the complaints allege violations of state law.

After answer and extensive discovery Andersen moved, in February, 1982, upon the affidavit of its counsel, Edward J. Ross, the exhibits submitted therewith, the pleadings and all the prior proceedings, for an order pursuant to Fed.R.Civ.P. 12(b)(1) and (6) and 56(b) dismissing the actions for lack of subject matter jurisdiction or, in the alternative, granting summary judgment in its favor on the claims pleaded under the federal securities laws, and, in either event, dismissing the pendent claims.  In April, 1982, the Banks submitted an answering affidavit of one of their counsel, an affidavit of Richard J. O'Neill, a Vice-President of Manufacturers Hanover, who had been involved in the transactions between the Banks and Frigitemp, and a statement of material facts, pursuant to S.D.N.Y.Civ.R. 3(g).  Mr. Ross submitted a further affidavit accompanied by numerous exhibits in May, 1982.

After receiving briefs and hearing argument, Judge Goettel filed a comprehensive opinion denying Andersen's motion, 552 F.Supp. 439 (S.D.N.Y.1982).  He first addressed the question whether any of the Frigitemp notes were securities within the pertinent provisions of the 1933 and 1934 Acts.  He discussed the relevant authori-

ties, particularly this court's decision in *Exchange National Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1137–38 (1976).  We will analyze that decision in detail below; it is sufficient here to say that we noted that under the statutes, any note having a maturity exceeding nine months was a security under the 1934 Act and any note was a security under the antifraud provisions of the 1933 Act unless the context otherwise required.  We proceeded to give many instances where the context did so require and said that:

> When a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should generally be held to apply.

*Id.* at 1138 (footnote omitted).  Judge Goettel held that the Note Endorsements, although having a maturity of more than nine months, "which were for a short term and which were secured by Frigitemp's customer notes receivable, bear a strong family resemblance to 'short-term notes secured by an assignment of accounts receivable,'" one of the examples cited in *Exchange National Bank*, and thus the context otherwise required that these not be considered securities within § 10(b) of the 1934 Act or § 17(a) of the 1933 Act.  552 F.Supp. at 448 (quoting *Exchange National Bank, supra,* 544 F.2d at 1138).

Turning to the Replacement Notes, Judge Goettel found that these bore no resem-

---

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**8.** Section 10 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**9.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

blance to any of the examples cited in *Exchange National Bank* and thus considered them to be securities for the purposes of § 17(a) of the 1933 Act, which had no provisions with respect to length of maturity. *Id.* He thought their status under the 1934 Act was not so clear because at the time of issuance they had a maturity of less than nine months, although, as he pointed out, "the actual effect of the Replacement Notes was to extend the maturity date on the existing unsecured notes from April 30, 1977 until March 31, 1978, a period of eleven months," *id.* at 448 n. 21, see also *id.* at 449. He concluded, however, that since under the "strong family resemblance" test the Replacement Notes would presumptively be securities under § 17(a) of the 1933 Act, it would make little sense to hold they were not securities under § 10(b) of the 1934 Act. *Id.* at 448–49. Finally, *id.* at 449–50, he rejected the argument that *Exchange National Bank* was no longer authoritative in the light of *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), citing our post-*Marine Bank* reaffirmation of *Exchange National Bank* in a different context in *Golden v. Garafalo,* 678 F.2d 1139, 1144–46 (2 Cir. 1982).

Judge Goettel then turned to the question whether the pledge of Elsters' stock would suffice to support jurisdiction over the federal securities laws claims even if the Replacement Notes were not securities. He thought it clear, citing *Rubin v. United States,* 449 U.S. 424, 431, 101 S.Ct. 698, 702, 66 L.Ed.2d 633 (1981), and *United States v. Gentile,* 530 F.2d 461, 466–67 (2 Cir.1976), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976), that a pledge of stock was a sale for purposes of § 17(a) of the 1933 Act and, citing *Mallis v. Federal Deposit Insurance Corp.,* 568 F.2d 824, 828–30 (2 Cir.1977), *cert. granted,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), *cert. dismissed,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), that it was a sale under § 10(b) of the 1934 Act. 552 F.Supp. at 450. He then addressed "[t]he question that has been debated by the parties", namely "whether the alleged fraud oc-

curred 'in connection with' the pledge of Elsters stock." *Id.* at 450–51. He noted Andersen's argument that "because there was no misrepresentation or omission concerning the value of Elsters stock or Elsters' financial condition, the pledge of Elsters stock cannot be used to sustain jurisdiction under section 10(b)," and the Banks' reply "that, to sustain jurisdiction under section 10(b), the fraud must merely 'touch upon' the sale, not relate to the value of the pledged securities." *Id.* at 451. The "touching" phrase comes from *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–169, 30 L.Ed.2d 128 (1971), and the judge, although recognizing that "[p]erhaps the Supreme Court will, when confronted with the issue, narrow the test for determining whether the 'in connection with' requirement has been satisfied", thought himself bound by Supreme Court and Second Circuit precedent to hold that the "in connection with" requirement had been satisfied and that the pledge of the Elsters stock supported jurisdiction over the federal securities laws claims even if the Replacement Notes were not securities. 552 F.Supp. at 453–54.

The judge then reviewed and rejected other arguments of Andersen unnecessary here to describe. He ended his opinion by saying, 552 F.Supp. at 457–58:

Although the Court believes that the present state of the law in this circuit precludes dismissal of the Banks' claims under the securities laws, it recognizes that there is substantial ground for difference of opinion on the jurisdictional questions—whether the Replacement Notes are securities and whether the pledge of Elsters stock is sufficient to support jurisdiction over this lawsuit. Because these are controlling legal questions, it appears that an immediate appeal from this decision will materially advance the ultimate termination of this litigation. Consequently, the Court will certify an interlocutory appeal on the jurisdictional questions pursuant to 28 U.S.C. § 1292(b) (1976), and will stay fur-

ther proceedings pending the outcome of the appeal.

A panel of this court granted leave to appeal.[10]

## DISCUSSION

### *The Replacement Notes as Securities*

■ In considering whether the Replacement Notes were securities within § 17(a) of the 1933 Act or § 10(b) of the 1934 Act, it will be useful, despite inevitable repetition, to begin with a full restatement of the statutory provisions [11] and a more extended summary of our opinion in *Exchange National Bank, supra.*

Under the 1933 Act, while § 2(1) provides that any note is a security unless the context otherwise requires, § 3(a)(3) expressly exempts from the registration and prospectus requirements "[a]ny note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." However, § 17, the general antifraud provision, specifies in subsection (c) that § 3 exemptions shall be inapplicable. In the 1934 Act Congress followed a different course. It provided, § 3(a)(10), that unless the context otherwise requires, "security" should include "any note" except that this would not include "any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

We began our discussion in *Exchange National Bank* by saying that "courts have shrunk from a literal reading [of these statutes] that would extend the reach beyond what Congress could reasonably be thought to have . . . intended in these two great pieces of legislation and would produce a seemingly irrational difference in the scope of their anti-fraud provisions." 544 F.2d at 1133. We then reviewed the only two cases in which this court had been required to decide whether notes constituted securities under the federal securities laws, *Movielab, Inc. v. Berkey Photo, Inc.,* 452 F.2d 662, 663–64 (2 Cir.1971) and *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 799–800 (2 Cir.1973), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), in both of which we had held the notes there in question to be securities within the 1934 Act. We then examined cases in the Third, Fifth, Seventh and Ninth Circuits which had come to a contrary conclusion on the differing facts there presented and commented on the "commercial-investment dichotomy" propounded particularly in *McClure v. First National Bank,* 497 F.2d 490 (5 Cir.1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975) and in *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354 (7 Cir.1975), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). We also took particular note of Judge Eugene Wright's narrower suggestion in a concurring opinion in *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1260–62 (9 Cir.1976), that a note given to a commercial bank in what purports to be an exercise of its lending function is never a "security" within the 1933 or 1934 Acts.

Finding difficulties in these formulations, we suggested that it might be well to pay more heed to the statutory language than

---

10. We think it proper to remind district judges that what 28 U.S.C. § 1292(b) authorizes is the certification that an "order involves a controlling question of law as to which there is substantial ground for difference of opinion", not the certification of questions as in 28 U.S.C. § 1254(3). See *Johnson v. Alldredge,* 488 F.2d 820, 822–23 (3 Cir.1973), *cert. denied,* 419 U.S.

882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). We thus would have been free, for example, to consider the ruling that the Note Endorsements were not securities if the Banks had asked us to do so.

11. A fuller statement of the history of these provisions is found in our *Exchange Nat'l Bank* opinion, *supra,* 544 F.2d at 1131–32 & nn. 7–10.

some courts had done.[12] Specifically we suggested:

> A party asserting that a note of more than nine months maturity is not within the 1934 Act (or that a note with a maturity of nine months or less is within it) or that any note is not within the anti-fraud provisions of the 1933 Act has the burden of showing that "the context otherwise *requires.*"

544 F.2d at 1137–38 (emphasis in original; footnote omitted). We then suggested many cases where the context does so require. We mentioned, *id.* at 1138:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized) [;]

and went on to say that "[w]hen a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should generally be held to apply," *id.* (footnote omitted).

Under the *Exchange National Bank* approach, our first question with respect to the status of the Replacement Notes as securities under the 1934 Act is to determine whether they had a maturity exceeding nine months. Andersen asserts that they did not since they were issued on August 9, 1977, and were payable on March 31, 1978, and the district judge seemingly accepted that assertion although pointing out, as previously stated, that "the actual effect of the Replacement Notes was to extend the maturity date on the existing unsecured notes from April 30, 1977 until March 31, 1978, a period of eleven months," 552 F.Supp. at 448 n. 21, see also *id.* at 449.

Decision of this question turns on whether Congress intended to apply the same test to the renewal of a note as it did to the original issuance. With respect to the latter it does seem clear that the date of issuance is critical. For example, a note issued on April 1 and maturing October 15 would fall within the exception even though the indebtedness, as evidenced, e.g., by an overdraft or book entry, had been incurred on and the note was dated as of January 1. What is not so clear is whether the same rule applies to the renewal of a note. It can be argued that the word "likewise" in the final clause of § 3(a)(3) picks up the entire phrase "a maturity at the time of issuance of not exceeding nine months". On the other hand, it can be contended that the term "likewise" embraces only the words "a maturity of not exceeding nine months" since, as indicated by the district court, it makes little business sense to exclude a period when renewed notes were still outstanding but overdue.[13] Moreover, unless the renewal clause is so construed, it is difficult to see what function it serves. However, even if we assume *arguendo* that the Replacement Notes had a maturity exceeding nine months and thus are not within the exception of § 3(a)(10) of the 1934 Act, we hold, in contrast to the district judge's understandable reading of *Exchange National Bank,* that the context requires that they not be considered securities within § 10(b) of the 1934 Act.

Andersen assails *Exchange National Bank* as a literalist approach to the definition of a security, running counter in this respect to *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 848–51, 95 S.Ct.

---

12. For example, Judge Roney conceded that his *McClure* opinion and other Fifth Circuit decisions virtually wrote out of the 1934 Act the distinction—seemingly drafted with care although without explanation of the reasons—between notes of more or less than nine months maturity. *McClure v. First Nat'l Bank, supra,* 497 F.2d at 494.

13. The anomaly would be still greater if the initial notes had a maturity exceeding nine months and were renewed for another period exceeding nine months but the date of renewal was such that less than nine months expired between that date and maturity.

2051, 2058–2060, 44 L.Ed.2d 621 (1975) (stock representing shares in cooperative apartment not within the meaning of the securities laws) and *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 557, 558 n. 11, 99 S.Ct. 790, 796, n. 11, 58 L.Ed.2d 808 (1979) (certificate of interest in non-contributory compulsory pension plan not a security within the meaning of the securities laws). *Forman* was decided prior to *Exchange National Bank* and was carefully considered therein, 544 F.2d at 1137; *Daniel* added nothing of substance so far as this case is concerned. Moreover, despite the pejorative label attached by some courts, see, e.g., *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 431 n. 6 (9 Cir.1978); *Union Planters National Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1180 n. 7 (6 Cir.1981), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *Baurer v. Planning Group, Inc.*, 669 F.2d 770, 776 (D.C.Cir.1981), and commentators, see, e.g., Sonnenschein, *Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions*, 35 Bus.Law. 1567, 1601 (1980), we do not regard *Exchange National Bank* as taking a "literalist" or even a "neo-literalist" approach. Its position was and is that the words of the statute are not to be disregarded, as some other approaches have done, see *supra* note 12, but are to be given significance "unless the context otherwise requires." This is the same approach we have taken with respect to the "sale of business" doctrine, where we have respectfully disagreed with the more freewheeling view of the Seventh Circuit in *Frederiksen v. Poloway*, 637 F.2d 1147 (1981), cert. denied, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), adhered to in *Sutter v. Groen*, 687 F.2d 197 (7 Cir.1982). See *Golden v. Garafalo, supra*, 678 F.2d 1139, 1145,

expressly approving the reasoning in *Exchange National Bank*.

However, language in *Marine Bank v. Weaver, supra*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 does cast some doubt on whether *Exchange National Bank* can properly be applied so as to hold the Replacement Notes to be securities under § 10(b), even assuming that they have a maturity of more than nine months. We say language because the actual holdings of *Marine Bank*, namely, that neither the pledge of a six year bank certificate of deposit which was insured by the Federal Deposit Insurance Corporation as security for a loan to a business corporation nor an agreement by the owners of the corporation with the pledgors of the certificate and the guarantor of the loan constituted a security for the purposes of the antifraud provisions of the federal securities laws, id. at 559–60, 102 S.Ct. at 1225–1226, are in no way counter to *Exchange National Bank*. Nevertheless, we cannot fail to take note of the Court's statement, id. at 556, 102 S.Ct. at 1223, after quoting the "if the context otherwise requires" language:

> Moreover, we are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud. *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1253 (CA9 1976); *Bellah v. First National Bank*, 495 F.2d 1109, 1114 (CA5 1974) [;]

and its footnote 10, id. at 560, 102 S.Ct. at 1225, reading:

> Cf. *Great Western Bank v. Kotz*, 532 F.2d 1252, 1260–1262 (CA9 1976) (Wright, J., concurring) (unsecured note, the terms of which were negotiated face-to-face, given to a bank in return for a business loan, is not a security).[14]

We are impressed also by the Banks' failure to cite any appellate decision, despite An-

14. The Court cited Judge Wright's opinion in *Great Western Bank & Trust* in footnote 10 as supporting authority for its holding that the "agreement, negotiated one-on-one by the parties, is not a security." 455 U.S. at 560, 102 S.Ct. at 1225. According to the recognized guide to legal citation method and style, popularly known as the "Blue Book," the introduc-

tory signal "*Cf.*", although literally meaning "compare," indicates that the cited authority "supports a proposition different from the main proposition but sufficiently analogous to lend support." A Uniform System of Citation 9 (13th ed. 1981). Thus, the Court's reference to Judge Wright's concurring opinion must be regarded as an approving one.

dersen's challenge to do so, in which a note evidencing a loan made by a commercial bank to finance current operations of a borrower has been held to constitute a security within the federal securities laws.[15] Indeed, the case law on this point outside this Circuit is squarely against the Banks' position. *See, e.g., Bellah v. First National Bank,* 495 F.2d 1109, 1114 (5 Cir.1974); *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc., supra,* 508 F.2d 1354, 1362; *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d 1252; *American Bank & Trust Co. v. Wallace,* 702 F.2d 93, 97 (6 Cir.1983).

The examples in *Exchange National Bank* of notes which, even though not falling within the less than nine months maturity exception of § 3(a)(10) of the 1934 Act, could not properly be regarded as securities, were not graven in stone, as evidenced by our remark that "[w]hen a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should *generally* be held to apply." 544 F.2d at 1138 (emphasis supplied; footnote omitted). We do not overrule the approach of *Exchange National Bank* that in the case of a note with a maturity exceeding nine months, the person asserting that the note is not a security within § 10(b) has the burden of demonstrating that the context otherwise requires. We simply add notes evidencing loans by commercial banks for current operations to the categories previously listed. By the same token such a note does not fall within § 17(a) of the 1933 Act, and it becomes unnecessary to consider whether Andersen participated "in the offer or sale" of the Replacement Notes as that section requires.

*Whether the pledge of the Elsters stock brings the August 1977 restructuring within the federal securities laws*

■ While vigorously contending that the Replacement Notes were securities, the Banks rely even more strongly on Judge Goettel's holding that Frigitemp's pledge of 100% of the stock of Elsters was a sale of a security by Frigitemp and a purchase by the Banks, that for this reason any misrepresentation by Andersen with respect to the financial condition of Frigitemp was "in connection with the purchase or sale of any security" under § 10(b) and Rule 10b–5, and that the entire August 1977 restructuring thus falls within these provisions.

Andersen's initial brief did not directly challenge the proposition that a pledge is a sale and purchase of a security under § 10(b), as we squarely held in *Mallis v. Federal Deposit Insurance Corp., supra,* 568 F.2d at 830. However, Andersen's reply brief contains some intimations that *Mallis* was adversely affected by *Rubin v. United States, supra,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 and that the contrary position taken in *McClure v. First National Bank, supra,* 497 F.2d 490, 495–96, *National Bank of Commerce v. All American Assurance Co.,* 583 F.2d 1295, 1300 (5 Cir.1978), and *Lincoln National Bank v. Herber,* 604 F.2d 1038, 1044 (7 Cir.1979), is correct.[16] We see no reason to disavow *Mallis.*

The predicate for Andersen's argument is the narrow basis on which Chief Justice Burger placed the Court's decision in *Rubin v. United States, supra,* that a pledge was an offer or sale under § 17(a) of the 1933 Act. He began by noting the definition in § 2(3) of "offer" and "sale" used in § 17(a) of the 1933 Act:

'The term "sale" or "sell" shall include every contract of sale *or disposition* of a security *or interest in a security,* for value. The term ... "offer" shall include every *attempt or offer to dispose of,* or solicitation of an offer to buy, a security *or interest in a security,* for value.'

**15.** *Exchange Nat'l Bank* was not such a case, for reasons developed in the opinion, 544 F.2d at 1138–39.

**16.** Other circuits have agreed with *Mallis.* See *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1028–29 (6 Cir.1979); *Weaver v. Marine Bank,* 637 F.2d 157, 163 (3 Cir.1980), *rev'd on other grounds,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982); *United States v. Kendrick,* 692 F.2d 1262, 1265 (9 Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983).

449 U.S. at 429, 101 S.Ct. at 701 (emphases supplied by Supreme Court). The Chief Justice then emphasized, *id.,* that "[a]lthough pledges transfer less than absolute title, the interest thus transferred nonetheless is an 'interest in a security,'" and added that "[i]t is not essential under the terms of the Act that full *title* pass to a transferee for the transaction to be an 'offer' or a 'sale,'" *id.* at 430, 101 S.Ct. at 701 (emphasis supplied).

Andersen's point is that since §§ 3(a)(13) and (14) of the 1934 Act do not include the words "or interest in a security", the *Rubin* opinion inferentially excludes a pledge from coverage under that Act. Arguably a fear of such a result is what led Justice Blackmun to concur only in the *Rubin* judgment and to place his concurrence on the simple ground that a pledge was a type of "disposition" covered by § 2(3) of the 1933 Act, citing this court's decision in *United States v. Gentile, supra,* 530 F.2d 461, 466, a provision for which there was a parallel in § 3(a)(14) of the 1934 Act. 449 U.S. at 431–32, 101 S.Ct. at 702–703 (Blackmun, J., concurring in judgment).

If this was Justice Blackmun's fear, the Court moved swiftly to allay it in a footnote to *Marine Bank v. Weaver, supra,* 455 U.S. at 554 n. 2, 102 S.Ct. at 1222 n. 2, also written by the Chief Justice. There the Third Circuit had held that a pledge of a certificate of deposit as guarantee for a loan was a sale of a security within § 10(b) of the 1934 Act. *Weaver v. Marine Bank,* 637 F.2d 157, 163–64 (3 Cir.1980). While, as indicated above, the Supreme Court reversed on the ground that the certificate of deposit was not a security, 455 U.S. at 558–59, 102 S.Ct. at 1224–1225, the Court stated with regard to the issue whether a pledge fell within § 10(b):

> The Court of Appeals also concluded that the pledge of a security is a sale [within § 10(b)], an issue on which the federal Circuits *were* split. We held in *Rubin v. United States,* 449 U.S. 424 [101 S.Ct. 698, 66 L.Ed.2d 633] (1981), *that a pledge of stock is equivalent to a sale for the purposes of the antifraud provisions of the federal securities laws.* Accordingly, in determining whether fraud may have occurred here "in connection with the purchase or sale of any security," the only issue now before the Court is whether a *security* was involved.

455 U.S. at 554 n. 2, 102 S.Ct. at 1222 (final emphasis in original; other emphases supplied). Although this may be dictum given the Court's conclusion that the transaction at issue did not involve a security, it is certainly considered dictum, particularly in view of the Chief Justice's authorship of both opinions, and dispels any negative inference with respect to the § 10(b) problem from the emphasis on "interest in a security" that might otherwise arise from the *Rubin* opinion.[17]

---

**17.** The legislative history also dispels any notion that significance should be attached in the present context to the omission of the phrase "an interest in a security" from the definitional sections of the 1934 Act. The original draft of the 1934 Act, S. 2693, 73d Cong., 2d Sess. § 3.12 (Feb. 9, 1934), provided:

> The terms "sale" and "sell" each include any contract of sale or disposition of, contract to sell or dispose of, attempt or offer to dispose of, or solicitation of or offer to buy a security or any interest therein.

This proposed language tracked that of § 2(3) of the 1933 Act. The final version of this bill, which was presented as a new bill, S. 3420, 73d Cong., 2d Sess. § 3(a)(14) (Apr. 20, 1934), and was enacted after the Senate and House conferees combined it with the House's companion legislation, pared down the language and provided simply:

The terms "sale" and "sell" each include any contract to sell or otherwise dispose of. While the relevant Senate hearings, debates and committee reports do not show the reason for this change of language, the proceedings in the House shed a glimmer of light.

The first bill presented to the House, H.R. 7852, 73d Cong., 2d Sess. § 3.12 (Feb. 10, 1934), was identical to its counterpart introduced the day before in the Senate, S. 2613, *supra.* Several weeks later, after conducting hearings, H.R. 8720, 73d Cong., 2d Sess. § 3(a)(15) (Mar. 19, 1934) was introduced. This bill contained the language that the Senate adopted in its final bill, S. 3420, *supra,* and that ultimately became part of the legislation. Section 3(a)(15) of H.R. 8720, *supra,* provided:

> The terms "sale" and "sell" each include any sale or any contract to sell or otherwise dispose of.

■ With this much established, we are ready to consider Andersen's more serious point with respect to the pledge of the Elsters stock. This is that the complaint does not allege that Andersen made any misrepresentation concerning Elsters.[18] Andersen contends, correctly so far as we have been able to ascertain, that all the cases imposing liability for violations of § 17(a) of the 1933 Act or § 10(b) of the 1934 Act or Rule 10b–5, in respect of pledges, are cases where the defendant committed a proscribed act with respect to the pledged securities. *See, e.g., United States v. Gentile, supra,* 530 F.2d 461, 466–67; *Mallis v. Federal Deposit Insurance Corp., supra,* 568 F.2d 824, 826–27; *United States v. Kendrick,* 692 F.2d 1262, 1265–66 (9 Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983); *Bradford Securities Processing Services, Inc. v. County Federal Savings & Loan Association,* 450 F.Supp. 208, 209–10 (S.D.N.Y. 1978). It argues therefore that even if it made any untrue statement of a material fact with respect to Frigitemp or omitted to

state a material fact concerning Frigitemp necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, this was not "in connection with" the Banks' "purchase" or Frigitemp's "sale" of the Elsters stock by way of the pledge to secure the $4,000,000 loan made to Elsters. The Banks' principal answer is that the Elsters loan was guaranteed by Frigitemp; that misrepresentations with respect to Frigitemp thus affected the entire Elsters transaction since Frigitemp's guarantee was less valuable than the Banks had thought and they would have to rely more heavily on the pledged Elsters stock; and that, since all three of the August, 1977 transactions were integrated and the Elsters loan involved the purchase or sale of a security, the misrepresentations affected all.

Section 10(b) of the 1934 Act was obviously drawn from § 17(a) of the 1933 Act; its principal effect (apart from the much debated question of the existence of an

This language remained part of the final version of the House bill, see H.R. 9323, 73d Cong., 2d Sess. § 3(a)(14) (Apr. 25, 1934).

A careful review of the relevant House debates, hearings and committee reports shows that the House's decision to omit the final clause of § 3.12 of H.R. 7852, *supra* (the original House bill), from § 3(a)(14) of its final version, H.R. 9323, *supra,* was indeed an attempt to narrow the definition of "sale," but only with regard to unconsummated attempts to acquire and offers to sell or purchase securities. There are no indications that the House intended to exclude transactions which, like pledges, include dispositions of securities.

The evidence for this is a statement of John M. Hancock, an influential member of the investment banking firm of Lehman Brothers. On March 2, 1934, Mr. Hancock appeared before the House Committee on Interstate and Foreign Commerce, the committee which was considering H.R. 7852 and 8720, *supra.* In an appendix to his written statement submitted to the committee, Mr. Hancock commented that §§ 3.11 and 3.12 of H.R. 7852, *supra,*

> have very broad definitions for the words "buy" and "sell", "buy" including an attempt to acquire an offer to sell, and "sell" including an attempt to secure an offer to buy. This makes a mere conversation have the same legal effect as the action resulting from this conversation.

*Stock Exchange Regulation: Hearing before the House Committee on Interstate and Foreign Commerce on H.R. 7852 and H.R. 8720,* 73d Cong., 2d Sess. (1934) (statement of John M. Hancock), *reprinted in* 9 Legislative History of The Securities Act of 1933 and Securities Exchange Act of 1934, at 493 (J.S. Ellenberger & E. Mahar eds. 1973). Evidently, the committee agreed with Mr. Hancock's concern and responded by deleting the troublesome language from the bill. See H.R. 8720, *supra.* In so doing, however, the committee, apparently as a result of drafting technique, also deleted the "interest in a security" language that had been part of the final clause containing the "attempt" language. Thus, the Committee's omission of the "interest in" a security language appears to have been only a drafting response to a suggestion aimed at an entirely different problem.

18. In response to an interrogatory propounded by Andersen whether Chemical asserted "that any information it received as to the business or financial condition of Elsters, Inc. was in any respect untrue or misleading or omitted to state any fact necessary to make such information not untrue or misleading", Chemical answered that it had no facts to support any such assertion but reserved the right to make such an assertion if discovery or other information subsequently obtained should reveal a basis for it. Jt.App. at 204.

implied private cause of action for damages under § 17(a)) was to cover frauds practiced on the seller as well as on the buyer. The legislative history sheds no light why Congress instead of simply expanding "in the offer or sale" phraseology of § 17(a) to read "in the offer, sale or purchase," adopted the "in connection with the purchase or sale" phraseology of ·§ 10(b). Although arguably "in connection with" has a somewhat broader sweep than "in", it may ·be just as true that the "in connection with" phraseology simply fit better with the rest of § 10(b). *Cf. United States v. Naftalin,* 441 U.S. 768, 773 n. 4, 99 S.Ct. 2077, 2081 n. 4, 60 L.Ed.2d 624 (1979) (The Court is "not necessarily persuaded that 'in' is narrower than 'in·connection with.'").[19] Courts sometimes err in attributing substantive importance to what may well have been only a draftsman's choice of slightly different language. As Judge Posner has observed, "Omniscience is always an unrealistic assumption, and particularly so when one is dealing with the legislative process." *Statutory Interpretation—in the Classroom and in the Courtroom,* 50 U.Chi.L.Rev. 800, 811 (1983). Professor Loss has recently stated that the "in connection with" phrase "is not the least difficult aspect of the 10b–5 complex to tie down." Fundamentals of Securities Regulation 903 (1983).

The difficulty has been somewhat increased by Justice Douglas' reference, in the Supreme Court's first brush with Rule 10b–5, to the plaintiff's having "suffered an injury as a result of deceptive practices *touching* its sale of securities as an investor." *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* 404 U.S. 6, 12–13, 92·S.Ct. 165, 168–169 (emphasis supplied). We are inclined to agree with Professor Loss, that "there is no reason to believe that the Justice's use of 'touching' was anything more than his variation of 'in connection with' as a matter of literary style." Loss, *supra,* at 903–04. There is no need for us to recapitulate the oft-described complex facts of the *Superintendent of Insurance* case. It suffices to point out that the Court had found, long before the "touching" reference, that "[t]here certainly was an 'act' or 'practice' ... which operated as a 'fraud or deceit' on Manhattan, the seller of [securities]", in that although "the full market price was paid for these bonds ... the seller was duped into believing that it, the seller, would receive the proceeds." 404 U.S. at 9, 92 S.Ct. at 167. Thus, the Court had concluded that "Manhattan was injured as an investor through a deceptive device which deprived it of any compensation for the sale of its valuable block of securities." *Id.* at 10, 92 S.Ct. at 168.

A leading treatise on § 10(b) and Rule 10b–5 suggests that the "connection" between fraud and·a securities transaction "can be very tenuous," 2 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud § 4.7(574)(3), at 88.34 (1982), a phrase which this court quoted in *United States v. Newman,* 664 F.2d 12, 18 (1981), *judgment following remand affirmed by order,* 722 F.2d 729 (2 Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983),[20] see also Note, *The Pendulum Swings Farther: The "In Connection With" Requirement and Pretrial Dismissals of Rule 10b–5 Private Claims for Damages,* 56 Tex.L.Rev. 62 (1977). However, statements to this effect have usually been made in cases· like *Newman* where the connection was anything but tenuous. In cases near the borderline, courts have warned that "[i]t is important that the standard be fleshed out by a cautious case-by-case approach." *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 595 (5 Cir.1974) (Wisdom, J.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). *Accord, Ketchum v.*

---

**19.** In support of its statement that the two terms had been used interchangeably, the Court pointed to Justice Douglas' opinion in *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* 404 U.S. at 10, 92 S.Ct. at 167–168, discussed *infra,* where shortly after quoting the "in connection with" language of § 10(b), Justice Douglas said, "For § 10(b) bans the use of any deceptive device *in* the 'sale' ...." (Emphasis supplied).

**20.** This seems to be the only occasion in which a court has quoted the phrase.

*Green,* 557 F.2d 1022, 1027 (3 Cir.1977) (Adams, J.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977). We ourselves have stated that *Superintendent of Insurance* "pushed the perimeters rather far", *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1014 n. 26 (2 Cir.1975).

As earlier stated, in August, 1977, Frigitemp not only was unable to repay the $6.5 million of secured notes and the $9 million unsecured notes but needed $4 million more. The Banks had to decide whether to let Frigitemp go under or to make the loans needed to keep it afloat and hopefully to survive. The complaints adequately allege that in deciding to renew the loans to Frigitemp and to loan $4 million to Elsters guaranteed by Frigitemp, the Banks relied on information concerning Frigitemp furnished by Andersen with knowledge of its falsity. This, however, would not bring the transaction within § 10(b) and Rule 10b-5 since neither the notes nor the guarantee were a "security." Does the case come within it because the Banks also obtained a pledge of 100% of the stock of Elsters [21] when there is no allegation that Andersen, which had never been Elsters' auditor, misrepresented the value of Elsters or its stock? In *Rubin, supra,* 449 U.S. at 429 n. 6, 101 S.Ct. at 701 n. 6, the Supreme Court stated that it "need not decide whether misrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves can form the basis of

a violation of § 17(a)." [22] We are here compelled to decide that question, with respect to § 10(b) and Rule 10b-5 as well as § 17(a); our answer is in the negative.

The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be. Andersen is not alleged to have deceived the Banks with respect to the pledge of the Elsters stock; the Banks got exactly what they expected. Their showing is simply that but for Andersen's description of Frigitemp they would not have renewed the Frigitemp loans or made the Elsters loan which Frigitemp guaranteed, and that if they had not done this, there would have been no pledge of Elsters' stock. Such "but-for" causation is not enough. [23] The Act and Rule impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part.

None of the many cases relied on by the Banks, *e.g., Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811, 812-13 (2 Cir.1975); *Arrington v. Merrill Lynch, Pierce, Fenner &*

**21.** At first blush it is hard to see what added security a lender obtains by a pledge of the stock of the borrower when it already has a claim against the borrower's assets ranking prior to the stock. However, in an answer to an interrogatory, Chemical averred that "[b]anks commonly take the stock of a company as collateral in order to obtain additional protection," which itself tells us nothing, and that it was felt "that, in the event of default, recovery realized on the foreclosure and sale of the equity would be higher than that realized on piecemeal foreclosure and sale of various assets of Elsters." Jt.App. at 205.

**22.** In the light of this express disclaimer we are unable to understand what comfort our dissenting brother derives from *Rubin* on the point here at issue.

We do not question that the complaint stated a claim of common law fraud with regard to the Elsters loan since the misrepresentations relating to Frigitemp affected its guarantee. But this is irrelevant to the issue whether Andersen is liable under § 10(b) of the 1934 Act or § 17(a) of the 1933 Act when it made no misrepresentation as to the only "security" involved in the transaction, to wit, the Elsters stock.

**23.** Borrowing the phraseology this court used in *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2 Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), the Banks' "but-for" allegation merely established "transaction causation." As described below, they have failed to establish the "loss causation" necessary for a legally sufficient claim under § 10(b) and Rule 10b-5.

*Smith, Inc.,* 651 F.2d 615, 619 (9 Cir.1981); and *United States v. Newman, supra,* 664 F.2d 12, 18, goes so far as they would take us here.[24] Perhaps the closest is the decision of a divided panel in *Weaver v. Marine Bank,* 637 F.2d 157, 159–60 (3 Cir.1980), *rev'd on other grounds,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). There the misrepresentations of the bank with respect to the Columbus Packing Co. allegedly induced the plaintiffs to make a pledge to a bank of a certificate of deposit, which the Third Circuit considered a security, in order to procure a bank loan to that company[25] in whose profits the plaintiffs were to share. Whether or not that case would have been correctly decided if the pledged certificate of deposit had been a security, it would not control here. The alleged misrepresentations in *Weaver* induced the plaintiffs to part with the pledged property; here the alleged misrepresentations simply induced the Banks to make loans collateralized by a pledge of a security as to which no misrepresentations were made. In order for this case to be ruled by the Third Circuit's decision in *Weaver,* one would have to change the facts so that because of Andersen's alleged misrepresentations concerning Frigitemp, the Banks released securities previously pledged to them by Frigitemp. We cannot believe that if a person misrepresents his financial condition in order to borrow $100,000 from a bank to which he gives a one month note partially secured by a pledge of GM stock, the case comes within § 10(b) and Rule 10b–5, although but for the pledge it would not. Yet this seems the inevitable consequence of the Banks' position here.[26] While, as the Banks argue, the misrepresentations as to the borrower's financial condition would require greater resort to the GM stock, and result in greater loss to the extent that the loan was not fully repaid, this is not enough to make the misrepresentations in connection with the purchase or sale of a security. It would be anomalous to hold that commercial bank loans procured by fraud are generally not within § 10(b) and Rule 10b–5, but that they become so, even though of a sort that no one would have considered to constitute a security, if collateralized with a security, although no misrepresentation was made with respect to the latter. It would be even more anomalous to hold that alleged misrepresentations concerning Frigitemp but not Elsters subject Andersen to liability for transactions, those involving the Note Endorsements and the Replacement Notes, in which no security played a part. Since the

---

24. *Arrington v. Merrill Lynch* was a classic case of misrepresentation by a broker with respect both to the specific securities being purchased and to the lack of risk in margin buying. *Competitive Associates* involved misrepresentation by an accounting firm with respect to an investment fund through which plaintiff intended to and did engage in massive trading in securities. In *United States v. Newman,* a criminal prosecution for insider trading, we found that "appellee's sole purpose in participating in the misappropriation of confidential takeover information was to purchase shares of the target companies", 664 F.2d at 18—obviously securities. In *A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 397 (2 Cir.1967), particularly relied on by the dissent, there was no question that the Perlows' fraud (placing orders for securities with the fraudulent intent of paying only if those had appreciated by the time payment was due) was in connection with the purchase and sale of securities. Here the pledge of the Elsters stock, as to which no fraud is alleged, was merely an incident in a transaction not otherwise involving the purchase or sale of securities.

25. The court considered, erroneously as matters turned out, that the profit sharing agreement was itself a security, and the "in connection with" discussion was in that context, see 637 F.2d at 164.

26. The dissent does not deal satisfactorily with this hypothetical. Its position, that a misrepresentation by a borrower with respect to a loan which is not itself a security renders the transaction subject to § 10(b) and Rule 10b–5 if it also involves a pledge, would cover the hypothetical. Indeed, the pledge of the GM stock would have been more important to the hypothetical transaction than the pledge of the stock of the borrower in this case, see *supra* note 21. Admittedly the bank in the hypothetical would have had better ways of evaluating the GM stock than the Banks here had with respect to the Elsters stock. But the point remains that Andersen is not charged with having made or aided or abetted the making of any false representations about the Elsters stock.

standard for connection imposed by § 17(a) of the 1933 Act is at least as high as that of § 10(b) and Rule 10b–5, it is unnecessary to discuss the question, which the Supreme Court has thrice declined to decide, see *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 1924, n. 6, 44 L.Ed.2d 539 (1975); *Aaron v. SEC,* 446 U.S. 680, 689, 100 S.Ct. 1945, 1951–1952, 64 L.Ed.2d 611 (1980); *Herman & MacLean v. Huddleston,* —— U.S. ——, 103 S.Ct. 683, 685 n. 2, 74 L.Ed.2d 548 (1983), whether there is a private right of action for damages under that section.

We thus hold that the Replacement Notes were not securities under § 10(b) of the 1934 Act or § 17(a) of the 1933 Act and that while the pledge of the Elsters stock was a sale of a security by Frigitemp and a purchase by the Banks, Andersen's alleged misrepresentations concerning Frigitemp (but not Elsters) were not in connection with the sale or purchase of the Elsters stock under § 10(b) of the 1934 Act and Rule 10b–5 issued thereunder or in the offer or sale of a security under § 17(a) of the 1933 Act. Since the first claims in the complaints must thus be dismissed for failure to allege violations of the federal securities laws, it would seem that the remaining claims must be dismissed under the principles laid down in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However, since the district court did not reach that issue, we leave the question for determination by it. No costs.

VAN GRAAFEILAND, Circuit Judge, concurring and dissenting:

I concur in Judge Friendly's customary well-reasoned opinion, except for that portion which holds as a matter of law that Arthur Andersen & Co. did not violate section 10(b). As to that portion I respectfully dissent. Because Arthur Andersen & Co. is alleged to be an aider and abettor of Frigitemp Corporation, discussion of the issue which prompts this dissent will be simplified by assuming that Frigitemp rather than Arthur Andersen is the defendant.[1]

In 1977, Frigitemp numbered among its assets 750 shares of Elsters, Inc., which was all the common stock of that wholly owned subsidiary. In August of that year, Frigitemp "sold" that stock to appellee banks within the meaning of section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b). *See Mallis v. Federal Deposit Ins. Corp.,* 568 F.2d 824, 830 (2d Cir. 1977), *cert. granted,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), *cert. dismissed as improvidently granted,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). Although Elsters' stock was not traded on any exchange and had no accurately ascertainable market value, appellees loaned Elsters $4 million as their part of the "sales" transaction. We have no way of knowing how much the banks would have loaned Elsters solely on the basis of Elsters' estimated net worth. It is undisputed, however, that they would not have advanced $4 million unless Frigitemp guaranteed that the money would be repaid. In short, then, the consideration for the $4 million loan was Elsters' promise of repayment plus a pledged asset and a guarantee of Elsters' allegedly solvent parent company.

This was a single transaction, a package deal, no part of which could have stood alone. To say, therefore, that there was no connection between the fraudulent misstatement of solvency and the "sale" of the asset and that "the Banks got exactly what they expected" is simply to blink reality. When a company sells something it owns, the purchaser does not get what he expects unless he receives the benefits of the warranties and guaranties that accompany the sale. *See, e.g., American Elec. Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp. 435, 442–43 (S.D.N.Y.1976).

Long before the enactment of section 10(b), purchasers of stock were permitted to sue for damages or rescission because of fraud committed against them in connection with their purchase. *See, e.g., Woods-Faulkner & Co. v. Michelson,* 63 F.2d 569 (8th Cir.1933) (defendant falsely represent-

1. Suit against Frigitemp was precluded by its    bankruptcy.

ed that, if plaintiff would buy 500 shares of stock from defendant at $12.50 a share, defendant would repurchase the shares at the same price); *Issenhuth v. Kirkpatrick,* 258 F. 293 (8th Cir.1919) (defendant sold plaintiff 250 shares of stock after misrepresenting the financial status of the company, the amount of defendant's own investment, and that plaintiff's investment would bring him a district managership in the company). Because cases such as the foregoing did not provide adequate protection for purchasers of securities, Congress enacted the Securities Acts to "[protect] the integrity of the marketplace in which securities are traded", *United States v. Brown,* 555 F.2d 336, 339 (2d Cir.1977), and to "achieve a high standard of business ethics . . . *in every facet of the securities industry." United States v. Naftalin,* 441 U.S. 768, 775, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979) (quoting with emphasis added *SEC v. Capital Gains Bureau,* 375 U.S. 180, 186–87, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)).

To accomplish this salutary purpose, we consistently have read section 10(b) "flexibly, not technically and restrictively", *Drachman v. Harvey,* 453 F.2d 722, 737 n. 3 (2d Cir.1971) (en banc), and have construed broadly the phrase "in connection with", *SEC v. Texas Gulf Sulphur,* 401 F.2d 833, 861 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *See United States v. Newman,* 664 F.2d 12, 18–19 (2d Cir.1981), *judgment following remand affirmed by order,* 722 F.2d 729 (2 Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). Moreover, we have held squarely that "a 10b–5 action will survive even though the fraudulent scheme or device is unrelated to 'investment value.'" *A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 397 (2d Cir.1967).

In *A.T. Brod,* the defendant was alleged to have placed orders for the purchase of stock with the fraudulent intent of paying for the stock only if its market price went up. In the instant case, the pledge (sale) of the stock was accompanied by a guarantee of redemption (repurchase), made largely meaningless because of false and fraudulent financial statements. *A.T. Brod* dealt with a promise to pay; the instant case deals with a promise to redeem. In both, there was misrepresentation with regard to the "sold" securities.

In *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 430 F.2d 355 (2d Cir.1970), the panel majority reverted to the "fair market price" test, finding a "structural difference between the sale of the corporation's bonds at a concededly fair price and the subsequent fraudulent misappropriation of the proceeds received." *Id.* at 360. Judge Hays, dissenting, cited numerous cases in support of his contention that this Court gave, and should continue to give, Rule 10b–5 a "broad and liberal interpretation." *Id.* at 362. In reversing, the Supreme Court cited *A.T. Brod & Co. v. Perlow, supra,* 375 F.2d at 393, and noted with apparent approval this Court's rejection in that case of the defendants' pleas that "no fraud is alleged as to the investment value of the securities nor any fraud 'usually associated with the sale or purchase of securities.'" 404 U.S. 6, 11 n. 7, 92 S.Ct. 165, 168 n. 7, 30 L.Ed.2d 128 (1971).

The Supreme Court also cited *Allico Nat'l Corp. v. Amalgamated Meat Cutters,* 397 F.2d 727 (7th Cir.1968), in which the defendant breached a contract to sell plaintiff stock in a wholly owned insurance company and misappropriated other shares of stock being held in escrow for plaintiff, and *Cooper v. North Jersey Trust Co.,* 226 F.Supp. 972 (S.D.N.Y.1964), which also involved the misappropriation of pledged securities.

In *Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811 (2d Cir.1975), we followed the teachings of both *A.T. Brod* and *Bankers Life.* In that case, the defendant accounting firm was alleged to have misrepresented the financial position of an investment fund, with the result that plaintiff retained the manager of the fund to manage plaintiff's own portfolio and suffered a resulting loss. Relying on the "touch" test of *Bankers Life, supra,* 404 U.S. at 12–13, 92 S.Ct. at 169, we rejected the defendant's claim that its audit

was not in connection with the purchase or sale of a security. 516 F.2d at 815.

In *Rubin v. United States,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), Chief Justice Burger, writing for himself and seven other members of the Court, said, "Obtaining a loan secured by a pledge of shares of stock unmistakably involves 'disposition of [an] interest in a security for value.'" *Id.* at 429, 101 S.Ct. at 701 (quoting § 2(3) of the Securities Act, 15 U.S.C. § 77b). Where, as here, fraudulent misrepresentations have led to the making of the loan, the fraud surely must have occurred in connection with the disposition of an interest in a security for value, *i.e.,* a 10(b) "sale".

With all due respect to my learned colleagues, I find little analogy to the present case in the situation posited by the majority in which a person pledges shares of General Motors stock as security for a $100,000 bank loan. In the first place, General Motors stock is nationally traded and has an established market value. In the second place, unlike Frigitemp, the would be borrower of $100,000 does not control the corporation whose stock he is pledging and to whom the loan is being made. The relationship between parent and subsidiary corporations has been a matter of continuing concern to the Supreme Court. *See e.g., Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 522–24, 61 S.Ct. 675, 683–684, 85 L.Ed. 982 (1941); *Taylor v. Standard Gas & Elec. Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939); *Chicago, Milwaukee & St. Paul Ry. v. Minneapolis Civic & Commerce Ass'n,* 247 U.S. 490, 501, 38 S.Ct. 553, 557, 62 L.Ed. 1229 (1918). An in-depth review of the many decisions in this area is not needed to establish that the obligations which Frigitemp owed to "the entire community of interests" in Elsters, *see Superintendent of Ins. v. Bankers Life & Casualty Co., supra,* 404 U.S. at 12, 92 S.Ct. at 169 (quoting *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939)), are not fairly comparable to those which the holder of a few shares of General Motors owes to that company's "community of interests."

I am satisfied that Frigitemp's fraudulent guarantee of the Elsters loan and its pledge of the Elsters stock were integral parts of a "single seamless web", *id.,* in which appellee banks were ensnared and that a clear 10(b) connection existed between them. This being so, there is no need to decide at this point whether the lending negotiations between Frigitemp and the banks were so integrated that the 10(b) connection carried over to the Frigitemp loans as well as that of Elsters. Because there was only one fraudulent scheme, so long as the district court has acquired jurisdiction of a portion of it that clearly is securities related, there is no reason why the court should not be permitted to dispose of the entire action. *See Errion v. Connell,* 236 F.2d 447, 454 (9th Cir.1956).[2]

**2.** I cannot illustrate better the differences which separate the majority and the dissent than by quoting the sentence which concludes footnote 24 of Judge Friendly's opinion:

Here the pledge of the Elsters stock, as to which no fraud is alleged, was merely an incident in a transaction not otherwise involving the purchase or sale of securities.

In holding that there was no fraud in connection with the pledge of the Elsters stock, the majority, of necessity, must disassociate the bailment of the stock from the underlying indebtedness which it secures. This, I suggest, misconstrues the basic elements of a pledge. A pledge is made up of "a bailment, a duty, and an agreement that the bailment is to secure the performance of a duty." Restatement of Security § 1 comment g. "No pledge exists in the absence of a duty which the pledge secures, except where the pledgee relieves the pledgor from personal liability beyond the amount which can be realized from the pledged chattel." *Id. See Wm. H. Wise & Co. v. Rand McNally & Co.,* 195 F.Supp. 621, 627 (S.D.N.Y. 1961). In short, the pledge and the debt secured by it are inseparable. *In re R & L Engineering Co.,* 182 F.Supp. 317, 320 (S.D.Cal. 1960); Restatement of Security § 29 comment e. I cannot agree, therefore, that, where, as here, fraud is alleged in connection with the guaranteed performance of the secured duty, this Court can hold as a matter of law that there is no connection between the fraud and the pledge.

I likewise cannot agree that, on the papers before us, we can hold that the pledge of the Elsters stock was a mere "incident" to the $4 million Elsters loan. If, as the majority correctly holds, a pledge is a "sale" for purposes of section 10(b), there is nothing about the pledge in the instant case that makes it more "incidental" than any other pledge.

In summary, we are dealing with a $4 million loan to a company so far financially removed from General Motors that its entire issue of common stock was required to be pledged as security. It was obvious to the lending banks that, if, as actually happened, Elsters could not repay the loan, the pledged stock would be greatly depreciated in value. For this reason, the banks sought and got a guarantee from Frigitemp that the secured obligation would be paid.

Assuming that the majority correctly reads an "incidental" connection exception into section 10(b), this is not a case for the application of that exception. Both the obligation and the guarantee of its performance were directly and intimately connected to the pledge.