**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul F. KENDRICK,
Defendant-Appellant.**

**No. 82–1190.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 12, 1982.

Decided Nov. 22, 1982.

Rehearing Denied Dec. 20, 1982.

John H. Boone, Boone, Knudsen & Martin, San Francisco, Cal., for defendant-appellant.

Charles B. Burch, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Appeal from the United States District Court for the Northern District of California.

Before MERRILL and BOOCHEVER, Circuit Judges, and SMITH,* District Judge.

MERRILL, Circuit Judge:

Appellant Paul F. Kendrick, a stockbroker, appeals from his conviction following jury trial of two counts of violating federal

---

* Honorable Russell E. Smith, Senior District Judge, United States District Court for the District of Montana, sitting by designation.

securities laws and one count of perjury. On appeal appellant makes many assignments of error. The principal issue presented is whether the actions taken by him in connection with margin accounts of two of his customers were taken "in connection with the purchase or sale" of securities in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)[1] and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5.[2]

## I.

Appellant in 1970 formed his own firm, Kendrick & Co., with its office in San Francisco, California. Appellant was the chief executive officer and principal shareholder. In 1971, Kendrick & Co. was licensed by the SEC. For two of its customers, Laurence Spitters and the Congregation of the Passion (a Roman Catholic religious order), Kendrick & Co. established margin accounts with Dean Witter & Co. in San Francisco, each of which accounts was secured by pledged securities owned by the customer and placed in the hands of Dean Witter. Dean Witter looked to appellant for instructions in the advancing of funds against the accounts.

By 1976 Kendrick & Co. was experiencing financial difficulties and its condition came to the attention of the National Association of Securities Dealers ("NASD"), a voluntary association of stockbrokers which acts as a self-regulatory body and attempts to discover and forewarn members of violations of SEC rules. On October 20, 1976, NASD informed appellant that Kendrick & Co. had a deficiency in net capital in violation of SEC rules, which deficiency amounted to $63,000.00. To meet this problem, appellant engaged in the actions with which we are involved. We need not describe them in detail. They are quite complex.

In brief, appellant wrote a check on his personal bank account in the sum of $150,000.00, deposited it in the bank account of Kendrick & Co. and had an associate notify the NASD that Kendrick & Co. had taken care of the net capital deficiency. Appellant's bank account did not have funds to cover such a draft. In a series of steps, he made unauthorized drafts on the Dean Witter margin account of Spitters and deposited the sum so secured in his own account, falsely reporting to Spitters that the withdrawals had been for the purpose of acquiring securities for him. Kendrick & Co. books did not properly reflect the transactions. Dean Witter, in accordance with representations of appellant, recorded the transactions as a loan to Spitters, secured by the pledged securities.

Appellant through a series of similar transactions converted to his personal use $27,000 from the Dean Witter account of the Congregation of the Passion, in order to cover checks used for the purchase of securities in appellant's personal account. Once again Dean Witter recorded the transaction as a loan. Appellant falsely told the Congregation's bookkeeper that the money

1. Section 10 reads in relevant part as follows:

   It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   \* \* \* \* \* \*

   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2. Rule 10b–5 reads as follows:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

withdrawn from the Congregation's account had been used to purchase securities.

## II.

1. The question presented is whether these acts constituted and thus were in connection with the purchase and sale of securities as those terms are used in § 10(b) and Rule 10b–5. We hold that they did.

*Rubin v. United States,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), involved § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), which makes it unlawful to engage in fraudulent conduct "in the offer or sale of any securities." The question there presented was whether a pledge of stock as collateral for a loan constituted an "offer or sale" under § 17(a). Petitioner, the pledgor, argued that the securities had been deposited with the pledgee "only as security for a loan, not as a transfer or sale." He argued that "the implied power to dispose of the stocks could ripen into title and thereby constitute a 'sale' only by effecting foreclosure * * * ". 449 U.S. at 429, 101 S.Ct. at 701.

The Supreme Court rejected this contention. Section 2(3) of the Act defined "sale" to include "every contract of sale or disposition of a security or interest in a security for value." The Court held that "[o]btaining a loan secured by a pledge of shares of stock unmistakably involves a 'disposition of [an] interest in a security, for value.' Although pledges transfer less than absolute title, the interest thus transferred nonetheless is an 'interest in a security'." *Id.*

The definition of "sale" in the 1934 Act, with which we are concerned, is set forth in Section 3(14) of the Act, 15 U.S.C. § 78c(14). It reads:

"(14) The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

In *Mallis v. Federal Deposit Insurance Corporation,* 568 F.2d 824, 829–30 (2d Cir. 1976), *cert. dismissed,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), the court gave the same meaning to "sale" in the 1934 Act that it had earlier given to the word as used in the 1933 Act, and held that a pledge of securities constituted a sale under Rule 10b–5. We agree with that holding. If a pledge of securities is a disposition of an interest in those securities, it follows that it also is a contract to dispose of that which is pledged. For purposes of § 10(b) of the 1934 Act and Rule 10b–5, then, Spitters and the Congregation were the defrauded "sellers" of securities and Dean Witter the "purchaser."

The fact that no new pledge was made in connection with the loans does not affect the outcome. It was not the fact that the securities were in the possession of Dean Witter that gave Dean Witter an interest in them. It was the fact that they were subjected as collateral to the new loans and that Dean Witter thereby acquired an interest in them in an amount equal to the amounts loaned. There was testimony by Dean Witter personnel that in issuing the checks drawn on the margin accounts Dean Witter engaged in an investment decision as to whether the stocks it already held were sufficient to cover its loss should the borrower default. Dean Witter gained an additional interest in the collateral as a result of the loans. When that interest was created, the "sale" occurred.

2. Appellant contends that his actions were not fraudulent. We find no merit whatsoever in this contention.[3] The court properly instructed the jury that it had to find that "defendant used a manipulative device which operated or would operate as a fraud or deceit on someone." There was ample evidence from which the jury could find fraud. Appellant failed to disclose to his customers (and also to Dean

---

**3.** Appellant contends for the first time in his Reply Brief that the jury instruction on fraud was erroneous because it did not require a finding that appellant had a duty to disclose. We do not consider this contention. "[T]he

general rule is that appellants cannot raise a new issue for the first time in their Reply Brief." *Thompson v. CIR,* 631 F.2d 642, 649 (9th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981).

Witter) that he was acting beyond his authority in using customer funds for his own use or the use of Kendrick & Co. Further, he falsely stated to each customer that the funds in question had been used to acquire securities for the accounts of the customers.

3. Appellant contends that if there was fraud it was disassociated in point of time from the "sale" and thus was not "in connection with" the sale as required to support a conviction under § 10(b) and Rule 10b–5. We find no merit in this. While some preliminary acts occurred prior to the loan from Dean Witter, the misrepresentations and omissions that caused the loans to be made were clearly fraudulent and in connection with the loans. At the time Kendrick caused Dean Witter to issue the checks on the margin accounts of Spitters and the Congregation, he was engaged in fraud.

■ 4. Appellant assigns as error the failure of the court to give a requested jury instruction to the effect that he may have had implied authority from Spitters to secure the draft from his account with Dean Witter.[4] This was not in error. There was nothing from which the jury could have concluded that appellant had implied authority to draw on Spitter's non-discretionary account for his own benefit. In any event, the jury instructions required that the appellant be found to have acted "willfully" and required the jury to consider "such factors as the nature of the relationship between the defendant and the people named in each count, and whether those people knew of, understood or authorized the defendant's particular actions." The instructions covered this aspect of the appellant's case adequately and that is all that is required. *United States v. Kenny,* 645 F.2d 1323, 1337 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425, 454

U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981).

■ 5. Appellant contends that there was a variance between the charge of the indictment (that he knowingly converted to his own use money belonging to the Congregation) and the proof (which was that the conversion, if there was one, was to the use of Kendrick & Co.) We find no merit here. The jury could have concluded that appellant used the $27,000.00 to aid his purchase of stock for his own account, because there was evidence that on the same day $27,000.00 was transferred from the Kendrick & Co. account into appellant's personal bank account. In any event, the withdrawal was to appellant's benefit, to keep Kendrick & Co. afloat. Even if there was some slight variance, no substantial right of appellant was prejudiced. *See United States v. Phillips,* 577 F.2d 495, 502 (9th Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978).

■ 6. Appellant was indicted for and found guilty of perjury in violation of 18 U.S.C. § 1621 in giving false testimony before the SEC. He had testified there that he had asked Father Parsons, an official of the Congregation, for permission to secure a $104,000.00 loan from the Congregation's Dean Witter margin account and that the official had given his approval.[5] This Father Parsons had denied in testimony in the course of trial below. Appellant challenges the sufficiency of the evidence of perjury in three respects. The standard of review is whether, reviewing the evidence in the light most favorable to the government, *any* rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560 (1979).

---

**4.** At trial, Spitters admitted that at a May 1978 SEC proceeding he had "testified that an implied authorization might have been interpreted from the course of transactions between myself and Kendrick and Co."

**5.** The $104,000.00 loan about which appellant testified falsely formed the basis of Count Two

of the indictment, which alleged that appellant misappropriated to the use of Kendrick & Co. those funds from the Congregation. The jury was unable to reach a verdict as to this Count but this alone does not void the perjury conviction.

First, he contends that the statements before the SEC, when taken in context, are equivocal.[6] We do not find them so and a rational jury could have found them unequivocal. If the apparent meaning was incorrect, the appellant had an opportunity to place the testimony in proper context had he so chosen.

Second, appellant contends that there was no proof that the false statement was willfully made. The jury was properly charged on appellant's theory and rejected it. A rational inference of willfulness from the proven facts was available.

Third, appellant contends that the government failed to meet the requirement that it produce testimony of two independent witnesses or one witness plus corroborating evidence. *Weiler v. United States,* 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945). There was ample corroboration. An accountant testified that the loan explanation was an after-the-fact concoction. A handwriting expert testified that Father Parson's signature on the confirmation letter was not genuine. An Internal Revenue Agent testified that appellant had explained to him that the $150,000.00 deposit in his personal account was a loan from the Congregation. The two-witness rule was more than satisfied.

7. Finally, appellant argues that his conviction should be reversed because of undue preindictment delay, citing *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Proof of prejudice is a necessary element of a claim of preindictment delay. *See United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). Appellant has failed to make any showing that he was prejudiced by delay other than speculation as to what one witness may have forgotten or what certain allegedly missing documents may have revealed. This does not suffice. *United States v. Mills,* 641 F.2d 785, 788–89 (9th Cir.), *cert. denied,* 454 U.S. 902, 102

S.Ct. 409, 70 L.Ed.2d 221 (1981); *United States v. Mays,* 549 F.2d 670, 677 (9th Cir. 1977).

JUDGMENT AFFIRMED.

---

**6.** Appellant had testified:

> Q. Did you ask Father Parsons for permission to borrow the money?
> A. Within that meeting I did.

Q. What did Father Parsons say?
A. He gave his approval for the loan.
Q. Are you sure?
A. Yes, sir.