In re Herbert Herman **WEISBERG** and Delphine Ruth Weisberg, Debtors.

Edward M. **WOLKOWITZ** and David R. Weinstein, Appellants,

v.

**SHEARSON LEHMAN BROTHERS, INC.**, Appellee.

BAP No. CC–94–1258–VJO.
Bankruptcy No. LA 91–10097–BR.
Adv. No. LA 93–01419–BR.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Nov. 15, 1995.

Decided March 14, 1996.

918

David R. Weinstein, Los Angeles, CA, for appellants.

Jeffrey D. Warren, Long Beach, CA, in pro. per.

Before: VOLINN, JONES, and OLLASON, Bankruptcy Judges.

### OPINION

VOLINN, Bankruptcy Judge:

### OVERVIEW

The debtor borrowed $50,000 from a stockbroker and provided collateral in the form of stock which was deposited in a margin account. After the debtor filed bankruptcy, as the stock decreased in value, the stockbroker at intervals, issued margin calls, and, on failure of the debtor or trustee to respond, liquidated portions of the stock without first seeking relief from the automatic stay of 11 U.S.C. § 362.[1]

On the trustee's complaint for violation of the automatic stay and turnover of postpetition transfers, the bankruptcy court ruled that the stockbroker's postpetition liquidation of the pledged stock was clearly exempted from the reach of the automatic stay by § 362(b)(6).[2] The court stated its intention to grant appellee's motion for sanctions (basically, appellee's attorney fees) under Rule 9011 for filing the complaint, but offered appellants an opportunity to reach agreement or stipulation with opposing counsel which would obviate the need for entry of an order on sanctions. Counsel then conferred privately and stipulated to an arrangement for payment of sanctions without order of the

---

1. Unless otherwise stated, all references to "sections" and "rules" refer to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. and the Federal Rules of Bankruptcy Procedure.

2. (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—

(6) under subsection (a) of this section, of the setoff by a commodity broker, forward contract merchant, stockbroker, financial institutions, or securities clearing agency of any mutual debt and claim under or in connection with commodity contracts, as defined in section 761 of this title, forward contracts, or securities contracts, as defined in section 741 of this title, that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, arising out of commodity contracts, forward contracts, or securities contracts against cash, securities, or other property held by or due from such commodity broker, forward contract merchant, stockbroker, financial institutions, or securities clearing agency to margin, guarantee, secure, or settle commodity contracts, forward contracts, or securities contracts.

11 U.S.C. § 362(b)(6).

court. Judgment on the merits was entered with no provision for or imposition of sanctions. The trustee moved to amend the judgment, to clarify his right to appeal the sanction. The court denied the motion and imposed sanctions against the trustee and his counsel for having brought the motion. The trustee and his counsel now appeal: (1) the ruling on the merits, (2) the provision for payment of sanctions which was stipulated to by counsel without order of the court, and (3) the sanction imposed by the court for seeking to amend the judgment. We AFFIRM.

## FACTS AND PROCEEDINGS BELOW

Prior to August 21, 1990, debtor Herbert Herman Weisberg ("the debtor") owned unencumbered shares of stock of City National Corporation ("the stock"). On August 21, 1990, the debtor signed a "Client Agreement" with Shearson Lehman Brothers, Inc. ("Shearson"), a licensed stockbroker, and put the stock in a cash account with Shearson.

On or about October 8, 1990, the debtor borrowed $50,000 from Shearson and transferred the stock from the cash account into a "margin loan" account to secure the loan. When Shearson advanced the funds to the debtor, it treated his stock as on "margin." While the debtor continued to own or carry the full value of the stock, then $105,235, as far as Shearson was concerned, with the transfer to the margin account, Weisberg had equity of only some $55,000 (105,235 − 50,000 = 55,235). This type of account required that the customer maintain an equity position of at least 35% over the market value of the account; if the value of the equity were to fall, Shearson would issue a "margin call" to the customer to deposit cash or other equity into the account to increase the equity and reduce the margin. If the

customer failed to respond to the call within four business days, Shearson would have the right under its Client Agreement and responsibility under the rules of the national stock exchange and the Federal Reserve Board, and pursuant to federal statute to liquidate sufficient shares of the stock and apply the proceeds to reduce the margin debt to restore the 35% equity ratio. On October 8, 1990, when the stock was transferred into the account, the ratio of equity to value was some 52% ($55,000 (equity) + $105,000 (total value) = .52), which exceeded the required 35%.

When the value of the stock fell, Shearson made a margin call on the debtor to maintain the equity ratio. The first call noted in the record was made on November 25, 1991. The following day, November 26, 1991, without responding to the margin call, the debtor filed a chapter 11 petition. Thereafter, the debtor, until July 1992, some seven months, functioned as debtor in possession. In July 1992, Edward M. Wolkowitz was appointed chapter 11 trustee.

The record shows that over the course of eleven months following the filing of the petition, Shearson made some fifteen calls, without response or reaction from either the debtor or the trustee.[3] When the calls remained unanswered past their deadlines, Shearson sold stock sufficient to reduce the loan balance and maintain the required margin in the account. Shearson never sought relief from the automatic stay prior to selling the stock. By August 18, 1993, the value of the account was $5,602, of which $2,412.15 was equity and $3,187.85 margin debt.

On January 29, 1993, the trustee filed a complaint setting forth three claims for relief. The first claim invoked § 549 of the Bankruptcy Code which provides for avoidance of post-petition transfers.[4] The trustee

---

**3.** We found no indication in the record provided to the panel for review that the trustee (or the debtor) was in contact with Shearson regarding the account prior to filing the complaint. In its request for admissions propounded in discovery, Shearson asked the trustee to admit that the first demand made on Shearson by the trustee was in December 1992. The trustee refused to so admit, but the issue has not been pursued to resolution.

To place events in some perspective: the chapter 11 case was filed, and the first margin call issued, in November 1991. The debtor remained debtor in possession for the next seven months;

Shearson issued margin calls over this period of time, the last call in our record having issued in October 1992, three months after the trustee's appointment. Shortly thereafter, in January 1993, the trustee commenced this action.

**4.** [T]he trustee may avoid a transfer of property of the estate—
 (1) that occurs after the commencement of the case; and
 (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
 (B) that is not authorized under this title or by the court.
11 U.S.C. § 549(a).

**920**

states that Shearson was a secured creditor as of the date of bankruptcy, November 26, 1991, and that the net value of the account over and above the $50,000 loan was some $26,000. According to plaintiff, the estate was entitled to this equity which actually increased as the value of the stock went up, the equity having gone as high as some $53,000 on or about February 29, 1992. Nevertheless,

> Shearson, without knowledge of the trustee or permission of the bankruptcy court, effectuated sales of stock from the account after the date the bankruptcy petition was filed ('post-petition transfers'). As a result of the post-petition transfers, Shearson as a creditor prompted its own repayment of the margin loan. Plaintiff is informed that the equity in the stock in the account is now dissipated or nearly dissipated.

Plaintiff's Complaint at ¶ 11.

The trustee's second claim sought damages resulting from violation of the automatic stay. The trustee realleged the facts set forth in the first claim under § 549 and simply stated that Shearson willfully sold the stock and refused to turn over to plaintiff "the account, the stock or equity therein" as a result of which the trustee was entitled to damages including punitive damages. *Id.* at ¶ 15.

The third claim was for turnover. The trustee invoked § 542 for turnover of the City National Bank stock or its value as it existed on the date of the bankruptcy petition "or was enhanced thereafter, and, as may appear necessary, further ordering Shearson to execute such documents of sale or conveyance, as may be necessary to give effect to the judgment for turnover." *Id.* at ¶ 20.

Shearson admitted in paragraph 11 of its answer that it liquidated portions of the stock from time to time after the debtor filed bankruptcy, explaining it did so for the purpose of satisfying "margin maintenance calls" because, in the absence of the deposit of funds by the debtor or the trustee, Shearson was required, under federal securities laws and the rules of the Federal Reserve Board and the National Securities Exchange, to liquidate portions of the account to meet the

margin maintenance calls. Shearson further contended that this liquidation was expressly permitted by the exception to the automatic stay set forth in § 362(b)(6). Shearson also admitted that as of the date of the complaint, February 24, 1993, the equity in Weisberg's account was $4,315.64.

Shearson responded further with nine affirmative defenses which may be condensed to the following:

1. That by virtue of § 362(b)(6) and § 555, and its status as a stockbroker involved in a securities contract as defined by § 741, it was not in violation of the automatic stay.

2. That by failing to respond to the numerous margin calls over a long period of time, the debtor and the trustee violated their fiduciary duty of prudence and due care, waived their right to rely on the automatic stay, and were estopped to rely on its application.

3. That the stock in their possession was the subject of a perfected security agreement and that the debtor had agreed that it be treated on a margin basis; that the trustee admitted the stock was pledged as collateral for the $50,000 loan from Shearson.

4. Shearson raised other defenses including, *inter alia,* waiver and estoppel, because of the failure by the debtor and the trustee to liquidate the account or seek a stay of Shearson's actions despite Shearson's repeated notices to them of the status of the account and the consequences of inaction.

Cross-motions for summary judgment were argued on September 13, 1993. Shearson contended that its sale of stock when the debtor failed to answer the margin calls fell squarely under § 362(b)(6). Shearson sought sanctions of some $11,000 under Rule 9011 for its attorneys fees and costs. Thus, the parties' contentions and arguments focused on Shearson's position as a stockbroker involved in a margin transaction, thereby rendering its liquidations subject to exception from the automatic stay.

The court agreed, holding that § 362(b)(6) clearly and unambiguously applied to the

facts and circumstances before it, and therefore, no stay violation occurred. Accordingly, the court ordered summary judgment for Shearson and denied the trustee's cross-motion.

The court stated that because § 362(b)(6) so evidently applied, Rule 9011 sanctions were warranted in the amount requested. However, the court indicated its reluctance to impose sanctions by an order on the record and stated that counsel could resolve the issue off the record by stipulation. The court expressly pointed out that settlement, since it would dispense with an order, would preclude an appeal as to the issue of sanctions. After a recess, the parties informed the court that an arrangement had been reached; accordingly, no sanction was ordered.[5]

Shearson served the trustee and lodged with the court a proposed order and proposed judgment on September 16, 1993. The judgment stated that the issue of sanctions had been resolved off the record. The trustee gave no indication on the record, nor any notice to the court, prior to entry of the judgment, that the stipulation with counsel as to sanctions and payment thereunder would be the subject of a request for review by appeal or otherwise. On October 8, 1993, the trustee filed a motion under Rule 9023 and Fed.R.Civ.P. 59(e) to alter or amend the judgment. The trustee asserted that he had not waived his appeal rights as to the sanction and asked the court to amend the judgment to reflect that sanctions had been imposed in order to clarify this position. Shearson opposed the motion and requested further sanctions of $3,293. The motion was heard on January 4, 1994. The court denied the motion and found it frivolous. The court imposed sanctions of $3,293 against the trustee and his counsel, jointly and severally.

The trustee and his counsel now appeal: 1) summary judgment on the merits that Shearson's sale of stock was exempt from the automatic stay; 2) the propriety of the "sanctions" paid to Shearson for commencing and pursuing the adversary proceeding; 3) denial of the motion to amend the judgment relative to the sanction issue and the sanctions imposed thereon.

## STANDARD OF REVIEW

A summary judgment is reviewed *de novo,* as are the court's conclusions of law determined therein. *In re Florida,* 164 B.R. 636, 639 (9th Cir. BAP 1994). All aspects of a trial court's award of sanctions under Rule 9011 are reviewed for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990); *In re Rainbow Magazine, Inc.,* 136 B.R. 545, 550 (9th Cir. BAP 1992).

## ISSUES PRESENTED

1. Whether the court committed reversible error when it determined that Shearson's sale of stock in the debtor's account was exempt from the automatic stay.

2. Whether the trustee has a right of appeal of damages paid voluntarily in the absence of a court order.

3. Whether the court abused its discretion by imposing sanctions for the Rule 59(e) motion.

## DISCUSSION

I. The Effect of the Automatic Stay.

The appellants argue two basic propositions here: First, that there was no pre-existing mutual debt which permits set-off by Shearson, and second, that the exception of § 362(b)(6) was inapplicable to a transaction which was basically a loan and a pledge.

### A. Mutuality

Appellants expended considerable energy at the trial level and on appeal contending that the exercise of Shearson's right of setoff was dependent on the existence, prior to bankruptcy, of a mutual debt between the parties; that such mutuality did not exist because Shearson had not incurred a prepetition obligation to the debtor. Appellants contend that Shearson could become obligated only by selling the stock in violation of the

---

**5.** Under the arrangement, Shearson received a payment of $6,000 from plaintiff's counsel and an administrative claim superior to the trustee and his counsel for the balance of the amount (some $5,000) sought in its motion.

§ 362 stay and delivering insufficient proceeds to the debtor, which would be a post-petition obligation.

The trustee's position, while using Bankruptcy Code provisions, (§§ 362, 549 and 542) as a vehicle, at bottom is based on the premise that Shearson mishandled or abused its position as a secured creditor holding collateral, all to the trustee's damage. Such a creditor was not free of any obligation to the debtor, since it was obligated by the agreement with the debtor to deal with the debt and the collateral in accordance with its terms. The agreement entered into prior to bankruptcy created mutual obligations which fall well within the broad definition relating to claims in the Bankruptcy Code. Section 101(11) defines "a debt" as a "liability on a claim." Section 101(5) defines "claim" as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

■ Thus, the definition of "claim" is extremely broad, covering claims of a contingent or unmatured nature. *See Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 2130–31, 109 L.Ed.2d 588 (1990) (Congress intended meanings of "debt" and "claim" to be coextensive and thus a criminal restitution obligation falls within definition of "debt" and "claim"); *Johnson v. Home State Bank*, 501 U.S. 78, 80, 111 S.Ct. 2150, 2152, 115 L.Ed.2d 66 (1991) (The mortgage lien that survives the discharge of a debtor's personal liability in Ch. 7 is a "claim" within the terms of

§ 101(5) susceptible to treatment by a Ch. 13 plan).

Based on the foregoing considerations, the trustee's contentions as to mutuality or lack of it are without merit.

### B. Section 362(b)(6)

■ Pursuant to § 362(a), virtually all actions against the debtor and its property are stayed automatically upon the commencement of a bankruptcy case. In § 362(b), the Code exempts some 18 distinct actions from operation of the automatic stay. Under the circumstances at issue here, § 362(b)(6) exempts:

the setoff by [various entities including] a . . . stockbroker, financial institutions . . . of any mutual debt and claim under or in connection with . . . securities contracts, as defined in section 741 of this title, that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section . . . 741 . . . of this title, . . . arising out of . . . securities contracts against cash, securities, or other property held by or due from such . . . stockbroker . . . to margin, guarantee, secure, or settle . . . securities contracts.

11 U.S.C. § 362(b)(6).

It should be noted that the coverage of § 362(b)(6) encompasses an array of activities and entities which includes "financial institutions." [6] It is common knowledge that the activities of banks and stockbrokers have broadened considerably to a point where each activity has converged and overlapped so that banks are involved in the sale of securities and stockbrokers are involved with money lending.

■ There is little legal precedent involving § 362(b)(6).[7] But it is clear that by virtue of § 362(b)(6), a stockbroker or a financial institution is not stayed from exercising its right to setoff a claim for a margin payment with securities of the debtor which the broker holds to margin, secure, or settle

---

**6.** This term, which includes commercial banks, savings banks, and various other banking entities, also includes a customer of the financial institution when the entity acts as agent for the customer in connection with a securities contract. 11 U.S.C. § 101(22).

**7.** The single case cited and discussed by the parties, *In re Amcor Funding Corp.*, 117 B.R. 549 (D.Ariz.1990), is inapposite. *Amcor* did not involve a margin call, but rather a broker who sought to liquidate its debtor-customer's account in the absence of a margin call when the broker itself became insolvent.

a securities contract. Appellants contend that the element of a securities contract is absent; they characterize the transaction at issue as "a simple, commercial loan, secured by previously free-and-clear stock" which is beyond the reach of § 362(b)(6). Appellants contend that once bankruptcy intervenes, a secured lender holding collateral of a delinquent debtor must first seek relief from the automatic stay in order to foreclose on the collateral. Appellants argue that if the transaction were a loan where the collateral were real property, the automatic stay would be in force. Appellants urge the panel to consider that stockbrokers are not universally exempted from the automatic stay; they may enter into transactions that, depending on the particular circumstances, would not entitle them to the carefully drawn exceptions of § 362(b)(6). In sum, appellants' basic position is that the debtor owned the stock and had full dominion over it prior to his relationship with Shearson; his transaction with Shearson simply involved obtaining a loan for which the stock was pledged as collateral. At the inception of this transaction, the creditor was more than adequately protected, holding some $105,000 of collateral to secure a $50,000 loan. Although this collateral, because of its nature, was subject to fluctuation in value, Shearson's unilateral set-off of its margin calls was not exempt from the automatic stay.

### 1. Was There a Securities Contract?

Appellants point out that under § 362(b)(6), the setoff of any mutual debt and claim must be one which is "under or in connection with ... securities contracts, as defined in § 741 of this title, that constitutes the set-off of a claim against the debtor for a margin payment as defined in section 101, 741 or 761 of this title...." The debtor contends that the relationship cannot be classified as a securities contract.

Section 741(7) states: " 'securities contract' means contract for the purchase, sale, or loan of a security ... or the guarantee of any settlement of cash or securities by or to a

securities clearing agency." As to a margin payment, § 741(5) states that the term "means payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin...." Appellants contend that none of the foregoing definitions apply to the basic transaction here. Taken literally, it would appear that since the transaction between the parties did not involve the purchase, sale, or loan of a security, nor a margin payment as defined in §§ 101 and 741, there is some question as to whether the exclusion should apply.

Although appellants would have us hew literally to the language of § 741(7), we do not scan its words "with the ease of a computer." *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). While the pledge does not immediately appear to fit into the foregoing definitional terms, it clearly was a transfer of an interest. Section 101(54) states that " 'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." [8]

In an analogous area dealing with securities regulation, a number of decisions have discussed the requirement that a "purchase and sale" of securities must be involved in order for an action for fraud under the Securities Exchange Act, § 10(b) and Rule 10b–5. In *First Baptist Church of Santa Ana v. Keating, et al.,* 49 F.3d 541, 543 (9th Cir. 1995), the court stated, "Courts have generally recognized that this 'purchase and sale' requirement should be read flexibly in order to effect the securities laws' remedial purposes." (noting, *inter alia, Vine v. Beneficial Fin. Co.,* 374 F.2d 627, 634 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), for "citing cases that 'indicate receptivity on different facts to a

---

8. In the legislative history to section 101(54) the House Report states: ... "Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, be-

cause possession, custody, and control are interests in property." (H.R.Rep. No. 595, 95th Cong. 1st Sess. 314 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6271.

broad construction of 'sale' under the Act and the Rule' "). In holding that the deposit of stock in an indemnity action trust constituted a purchase by the trust, the *American Continental* case stated:

> Although we find no case with facts directly on point, we take guidance from the various transactions that have been held to constitute a purchase and sale. For instance, in *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), the Supreme Court held that a pledge of stock to a bank as collateral for a loan constituted a "sale" for purposes of Section 2(3) of the Securities Act of 1933.[9] The *Rubin* Court reasoned that
>
> > the economic considerations and realities present when a lender parts with value and accepts securities as collateral security for a loan are similar in important respects to the risk an investor undertakes when purchasing shares. Both are relying on the value of the securities themselves, and both must be able to depend on the representations made by the transferor of the securities....
>
> *Id.,* 449 U.S. at 431, 101 S.Ct. at 702.
>
> Accordingly, this court has applied *Rubin* and *Weaver* to hold that a pledge of securities to secure a margin brokerage account constituted a "purchase and sale" for the purpose of Section 10(b) and Rule 10b–5. *United States v. Kendrick,* 692 F.2d 1262, 1265 (9th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983). *See also Harmsen v. Smith,* 693 F.2d 932, 947 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

49 F.3d at 543.

*Mallis et al. v. Federal Deposit Insurance Corp.,* 568 F.2d 824, 828 (2d Cir.1977), also held that a pledge of stock was a sale. The court referred to and cited from *United States v. Gentile,* 530 F.2d 461 (2d Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976), which stated "In effect, the pledgee assumes a very real investment risk that the pledged securities will have continuing value, a risk that is identical in

nature to the risk taken by investors which serves as the indisputable basis for statutory regulation of securities transactions. We therefore find no reason to treat the equivalent risks differently under the statute." 530 F.2d at 467 n. 6.

There is authority the other way. *Rispo v. Spring Lake Mews, Inc.,* 485 F.Supp. 462 (E.D.Penn.1980), held that a promise to deliver stock made in conjunction with a commercial loan transaction did not constitute a sale or purchase of a security so as to be governed by federal securities laws, and noted a split in the circuits. However, because of the Ninth Circuit holding in the *American Continental* case, we are of the view that the Ninth Circuit would agree with *Mallis,* which appears to represent the weight of authority. *Mallis* was followed by *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930 (2d Cir.1984), which, after discussing the split in the circuits, concluded that it would follow *Mallis* and cited with approval *U.S. v. Kendrick,* 692 F.2d 1262, 1265 (9th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983) (cited in *American Continental* ) as also following *Mallis.*

In order to evaluate how the law should be applied here, it is useful to observe the purpose of Congress in enacting § 362(b)(6). This can be discerned from the Congressional Record:

> It is essential that stockbrokers and securities clearing agencies be protected from the issuance of a court or administrative agency order which would stay the prompt liquidation of an insolvent's positions, because market fluctuations in the securities markets create an inordinate risk that the insolvency of one party could trigger a chain reaction of insolvencies of the others who carry accounts for that party and undermine the integrity of those markets.

128 Cong.Rec. § 15981, (daily ed. July 13, 1982) (remarks of Mr. Dole).

Appellants' argument that the transaction did not involve a sale of stock but only a loan and pledge of stock as collateral elevates form over substance. It is clear that by

---

**9.** [footnote 2 in original]

*In Marine Bank v. Weaver,* 455 U.S. 551, 554 n. 2, 102 S.Ct. 1220, 1222 n. 2, 71 L.Ed.2d 409 (1982), the Court noted that its holding in

> *Rubin* also applied to a pledge forming the basis of a fraud claim under § 10(b) of the Securities Exchange Act of 1934.

virtue of the language of § 362(b)(6), a stockbroker acting as a financial institution should have the benefit of ability to move quickly because of market fluctuations where collateral such as stock is transferred by way of pledge to secure a loan. In our view, and consistent with the foregoing authorities, it is appropriate to equate the pledge with a sale in order to afford the stockbroker or financial institution holding stock as collateral to move quickly to avail itself of the collateral before it self-destructs. Therefore, the exception of § 362(b)(6) would exempt Shearson from the stay of § 362(a).

### 2. Alternate Grounds For Affirmance

There are other grounds for affirming on this point. While the court's immediate disposition by summary judgment was based on its interpretation of § 362(b)(6), the decision can be affirmed on other grounds appearing on the record, albeit not argued. *See First Pacific Bank v. Gilleran,* 40 F.3d 1023, 1024–25 (9th Cir.1994), *cert. denied,* — U.S. —, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995). This principle applies in review of a summary judgment where the reviewing court may affirm on grounds other than those stated by the court below, if the record provides such grounds. *See J. Jack Bras v. Cal.Pub. Utilities Comm'n,* 59 F.3d 869, 872 (9th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 800, 133 L.Ed.2d 748 (1996). *See also In re Canino,* 185 B.R. 584 (9th Cir. BAP 1995).

The panel may affirm the bankruptcy court on any grounds supported by the record. *In re Frontier Properties, Inc.,* 979 F.2d 1358, 1364 (9th Cir.1992); *In re Bradford,* 112 B.R. 347, 353 (9th Cir. BAP 1990). In addition, we may consider a legal issue not raised on appeal where the matter is one of law and further development of the factual record is not necessary. *Bolker v. Comm'r,* 760 F.2d 1039, 1042 (9th Cir.1985). Whether a filing period is subject to equitable estoppel is a matter of law, reviewed *de novo. In re Santos,* 112 B.R. 1001, 1004 (9th Cir. BAP 1990).

185 B.R. at 594.

### a. The Issue of Estoppel or Waiver

■ Assuming *arguendo* that Shearson was not exempt from the automatic stay by virtue of § 362(b)(6), nevertheless it is clear that the debtor should have taken some action independently or in response to the margin calls. One cannot disregard the debtor's and the trustee's continued acquiescence with Shearson's effort to maintain an appropriate collateral-debt ratio. The debtor and trustee received fifteen margin calls over a period of eleven months. Their lack of response is inexplicable, particularly since cash collateral was involved. The debtor, having pledged the stock, should have taken the initiative to petition for its release while it had equity. The only rational basis for this inaction was the hope that the value of the stock would increase. But this hope was burdened by the agreement to treat the collateral on a margin basis. The trustee seeks the best of both worlds. Apparently, the trustee concludes that Shearson was to insure any loss. Such a conclusion is not warranted on the facts of this case.

Shearson's liquidations were in response to the declining market value of its security. Shearson had an absolute right to its security, and to maintain it on a current margin basis. Shearson was not responsible for the decline in value of the collateral, and in fact, could do nothing to prevent it. Thus, it was the inaction of the debtor and subsequently the trustee, not Shearson's failure to move for relief from the stay, that resulted in the loss to the estate.

The injunctive aspect of § 362 is one which calls into play equitable principles. The question arises as to whether the debtor contributed to its alleged damage by remaining quiescent despite the numerous margin calls by Shearson. Pursuant to the equitable principle that equity aids the vigilant, the doctrine of laches would be applicable. *See Arthur Matthews Jr. v. Martin J. Rosene, et al.,* 739 F.2d 249 (7th Cir.1984), where the court held that the debtor had unreasonably and inexcusably delayed asserting his claims against state court jurisdiction to the bankruptcy court. In that case the court stated:

The First Circuit has applied equitable principles to protect creditors from unwarranted liability arising from application of § 362. In *In re Smith Corset Shops, Inc.,* 696 F.2d 971 (1st Cir.1982), the creditors brought an action against the shop owner for trespass and ejectment.... The state ruled for the creditors, allowing them to

move the shop owner's goods out of the store.... Unknown to anyone involved in the state court action, the shop owner four days earlier had filed for Ch. 11 reorganization.... The First Circuit, however, reinstated the bankruptcy's court's ruling in favor of the creditors. The court ruled in part that § 362 is subject to equitable considerations....

The equitable doctrine of laches can apply in a similar manner in this case to defeat Matthews' claims.... Suspension of § 362 automatic stay provisions may be consonant with the purposes of the Bankruptcy Act when equitable considerations weigh heavily in favor of the creditor and the debtor bears some responsibility for creating the problems.

The district court did not abuse its broad discretion in applying laches here. The record supports the district court findings that Matthews unreasonably and inexcusably delayed asserting his claim against state court jurisdiction to the bankruptcy court and that Rosene would be seriously prejudiced if the state court order is voided.

739 F.2d at 251.

In light of the facts before us, particularly the debtor and trustee's failure to take the initiative to do something about the debtor's collateral as required by §§ 363 and 361, and their passive behavior with respect to the margin calls, the appellants' argument amounts to a "heads I win, tails you lose" proposition. If the stock went up, they could only win. If the stock went down, according to the complaint, Shearson would lose and have to make up to the debtor the market loss and the value of the stock. This would be a result which no principle of equity should countenance.

b. *Implications to be Drawn From Shearson's Status as a Secured Creditor Holding Pledged Collateral*

██ The granting of the collateral interest was a transfer which occurred prior to

bankruptcy. Therefore, the effect of Shearson's liquidations after bankruptcy constituted foreclosure of an interest it already had rather than transfer. On this basis, § 549 is inapplicable. Also, because the stock was liquidated, it is not subject to turnover.

██ Returning to the complaint, it is interesting to note that the trustee at paragraph 1 suggests that "To the extent required by law, plaintiff can and will provide Shearson adequate protection in the form of a replacement lien against cash proceeds of the stock which may come into plaintiff's possession by virtue of his use, sale, or administration of the account or stock." This statement is made relative to the request that Shearson turn over the City National Bank stock or its value as of the date of the petition pursuant to § 542. Aside from the fact that trustee did not deny that Shearson has a valid security interest in the stock, implicit in the offer of adequate protection is an admission that Shearson had a valid and subsisting security interest in the stock. The Uniform Commercial Code, § 9–305, specifically provides that possession by the secured party of negotiable instruments perfects a security interest without filing. Under this section, possession of a stock certificate given as collateral for a debt constitutes perfection. *Heinicke Instruments Co. v. Republic Corp.,* 543 F.2d 700, 701–02 (9th Cir.1976).

Stock or corporate securities constitute cash collateral as provided for by § 363(a),[10] which includes negotiable instruments and securities in its definition of cash collateral. Both the debtor and the trustee knew the stock was being sold by Shearson based on a formula which maintained a certain ratio of collateral value and debt. While there was a surplus equity, the debtor could have petitioned, pursuant to § 363 for the use or possession of the securities, but it could obtain the securities only by furnishing adequate protection in the form of a lien pursuant to § 361.[11] Since Shearson already had a

---

10. § 363(a) provides:

In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate

and an entity other than the estate have an interest....

11. Section 361 provides three methods for providing adequate protection:

lien, the trustee's offer of adequate protection, particularly after the stock had been sold on a falling market, was illusory. Further, no offer of adequate protection was accompanied by a tender or any evidence of an ability to replace the stock with cash or property of commensurate value.

In any event, as indicated, the security interest was in cash collateral. The debtor would not be permitted access to the collateral without offering and furnishing adequate protection, which it never did. If the debtor had or has collateral, the value of which would be the indubitable equivalent of the City Bank stock, it is difficult to understand how the debtor would suffer any damage from the secured creditor's attempt to maintain the stock, which it did not have to part with unless, pursuant to § 361(3), its "indubitable equivalent" were furnished in order to maintain the stock at an agreed ratio of actual value.

### c. Lack of Damages

 Assuming *arguendo* an intentional violation of the stay, this case might present an issue as to damage. The underlying problem here is that if Shearson had an unassailable security interest in the property, what damages did the trustee suffer assuming violation of the automatic stay? Section 362(a)(4) enjoins "Any act to create, perfect, or enforce any lien against property of the estate." Section 362(h) provides that "An individual injured by any willful violation of a stay provided by this section shall recover actual damages including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

Clearly, no one prevented the debtor or the trustee from requesting the surplus value of the securities. Even if Shearson had simply waited and had not made or acted on any

margin call, on the record before us, it is hardly likely that the margin call was the cause of or contributed to the trustee's inaction. Thus it is difficult to understand the trustee's disregard of the fact that had the debtor acted providently and promptly, Shearson's actions to maintain the agreed relationship between the dropping value of its collateral and payment of debt would not have been required. Thus the debtor harmed itself.

As previously discussed, the character of the stock as cash collateral, which requires the furnishing of an indubitable equivalent for its use, affects the issue of damages. In the case of *In re Lough*, 163 B.R. 586 (Bankr.D.Idaho 1994), the court held that the respondent credit union did not violate a stay by placing a freeze on a deposit securing its overdraft protection loan to debtor depositors. The court alluded to the case of *In re Edgins*,[12] 36 B.R. 480 (9th Cir. BAP 1984), stating:

> Moreover, even if ICCU's actions technically violated the automatic stay, the debtors would have no remedy. Section 362(h) provides ". . . [for recovery of actual damages]. . . ."; The debtors did not have the right to access money in the account without Court permission, and so could not be injured by the freeze. If the debtors tried to remove money from the account, it was an attempt to violate section 363 and ICCU's actions were justified; if the debtors did not try to remove money from the account, the presence of the freeze in no way harmed, hindered or injured the debtors' rights. Under the present facts, and in the absence of injury, sanctions under section 362(h) are inappropriate.

163 B.R. at 589.

It is clear that even if there were a violation of the stay, no showing has been made

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

**12.** The United States Supreme Court in *Citizens Bank of Maryland v. Strumpf*, —— U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), has endorsed cases approving the administrative freeze.

that the debtor incurred any damage or loss by virtue of the secured creditor's efforts to maintain the agreed equity ratio in the debtor's account. Because the stock was cash collateral, the burden was on the debtor to request sale of the stock on a prudent basis. It could not reasonably expect the secured creditor, holding the stock on a margin basis, to gamble on a rising market. The damage suffered by the estate was attributable to the debtor and the trustee's own failure to conserve the current value of the stock, rather than to the action taken by Shearson.

## II. Appeal of "Sanctions"

■■■ The panel determines its jurisdiction *sua sponte. In re Martinez*, 721 F.2d 262, 264 (9th Cir.1983). The Bankruptcy Appellate Panel is able to hear appeals under 28 U.S.C. § 158. Pursuant to this statute, the panel has jurisdiction to review the orders of bankruptcy judges, whether final or interlocutory. 11 U.S.C. § 158(a). Appellants have no basis for review of their payment of Shearson's attorney fees because the payment was not premised on an order of the court.

Appellants argue that the court clearly ordered sanctions from the bench, and that their off-the-record arrangement for payment of the sanction cannot change that. However, the court invited appellants to resolve the matter *in lieu of* an order, and thereafter, the court expressly did not impose sanctions. As no sanction was ordered, the panel has no order to consider, and consequently, no jurisdiction to review.

■■■ Appellants paid a portion of the sanction by check accompanied by a letter specifying that payment was subject to the proviso that deposit of the check would acknowledge that the sanctions thus paid were appealable. Shearson deposited the check. Appellants contend that Shearson therefore waived its right to deny that the sanction is appealable. This contention ignores the basis for lack of jurisdiction. The parties cannot create jurisdiction either through agreement or waiver; there is no sanction order to review.

The appellants contend that it was not the intention of the court and the parties to deprive them of the right to appellate review. The record shows that the court and the appellees were willing to afford appellants an opportunity to settle the matter without an order being entered by the court. The matter was openly discussed. Appellants chose to accept this alternative. Considering the problems before them at the time, there was logic in their doing so. They were faced with the loss of a case in which a great deal of time had been expended. There was a prospect that the sanction order would be reported to the bar association. They did not know what would happen in the event of an appeal which might be won or lost. The stipulation presented an opportunity to forego the entry of an order which might be stricter and could have adverse consequences in the event of losing the appeal. The stipulation provided not only for the settlement of a sanction amount but for partial payment in cash and for a super priority payment out of the estate for the balance. This was certainly less onerous than being faced with the direct imposition by an order with more stringent terms. Further, even as to the super priority payment, appellees were faced with the possibility of creditors' objection to the stipulation and were willing to take the risk in order to accommodate appellants. When the court entered the order, appellants gave no indication that they were considering appealing the stipulated provision for sanctions. Appellants calculatedly permitted the matter to be disposed of by the court without provision for sanctions.

## III. The Motion for Reconsideration

Appellants moved for amendment of the judgment under Rule 59(a), which provides, "the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct entry of a new judgment."

"There are three grounds for granting new trials under Rule 59(a)(2): (1) manifest error of law; (2) manifest error of fact; and (3) newly discovered evidence." *Brown v. Wright*, 588 F.2d 708, 710 (9th Cir.1978) (citing 6A *Moore's Federal Practice* ¶ 59.07 at 59–94). *See also School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994)

("There may also be other, highly unusual, circumstances warranting reconsideration").

Although not directly stated, appellants' argument suggests that a manifest injustice would occur in the event they prevailed on the merits but nevertheless bore the burden of a losing party's attorneys fees. However, as previously discussed, there were no appealable sanctions to begin with. Appellants' argument is based on an alleged order, entry of which was deflected by their own considered action. Thus, the motion for reconsideration was based on a non-existing hypothesis. It was without merit, and the court did not abuse its discretion by imposing sanctions.

## CONCLUSION

The summary judgment is affirmed, as is the order denying the motion for reconsideration. The imposition of sanctions on the trustee and his counsel for seeking amendment of the judgment is affirmed.

AFFIRMED.